WILLIAM B. ROSE & others *vs.* COMMISSIONER OF
PUBLIC HEALTH & others.
(and a companion case [1]).

Hampshire.    March 7, 1972. — April 20, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, & HENNESSEY, JJ.

*Dump. Public Health. Zoning,* Dump, Municipal use. *Public Board. Words,* "Municipal use."

A zoning ordinance which permitted, among other uses, a municipal use in a residential district, empowered the local board of health to operate, through a private contractor, a sanitary landfill on municipally owned land in such a district for the benefit of residents of the municipality, and a permit for such use from the board of appeals was not required. [629–632]

Under G. L. c. 4, § 6, Fifth, the two lay members of a three-member local board of health were vested with the authority of the board, and the board could act by a vote of such members notwithstand-

---

[1] The companion case is Board of Health of Northampton *vs.* Board of Appeals of Northampton.

ing a vacancy in the third position, which was required by statute to be filled by a physician. [633]

TWO BILLS IN EQUITY filed in the Superior Court on June 20, 1969, and November 4, 1969, respectively.

The suits were heard by *Lurie,* J., and the second suit was reported by him without decision. In the second suit the plaintiff claimed exceptions to certain rulings by *Linscott,* J.

*Raymond R. Cross* for William B. Rose & others.

*Thomas M. Growhoski,* City Solicitor, for the Board of Health of Northampton.

*William H. Welch* for Calduwood Enterprises.

*Gregor I. McGregor,* Assistant Attorney General (*Allan G. MacDonald,* Assistant Attorney General, with him) for the Commissioner of Public Health.

*John C. O'Donnell,* for the Board of Appeals of Northampton, joined in a brief.

CUTTER, J. In the first case, Rose and other abutters (the abutters) sought review (G. L. c. 30A)[2] in the Superior Court of a decision of the Department of Public Health (the department) approving the assignment by the city board of health of land (the locus) as a sanitary landfill dump. The abutters now appeal from the Superior Court decree affirming the department's decision.

In the second case, the city board of health appealed (G. L. c. 40A, § 21) from a decision of the Northampton board of appeals denying a permit to operate a dump on the locus. Calduwood Enterprises (Calduwood), the pro-

---

[2] The department now raises for the first time the question whether the first case should be before us under c. 30A or by certiorari. The matter was heard by the department under G. L. c. 111, § 150A, as amended (see fn. 3) on an appeal by specifically named persons after a public hearing required by that section. See G. L. c. 30A, § 1 (1), as amended through St. 1966, c. 497. The matter of review under c. 30A was not discussed in *MacDonald* v. *Board of Health of Braintree,* 347 Mass. 76, 77–78, but it was strongly intimated in *Commissioner of Pub. Health* v. *Board of Health of Tewksbury,* 350 Mass. 507, 509, that review under c. 30A was proper. In any event, we would regard this fully argued matter as one where we should declare the rights of the parties. *Wellesley College* v. *Attorney Gen.* 313 Mass. 722, 731.

posed operators of the dump, and the abutters, were allowed to intervene. A Superior Court judge reserved and reported specified issues of law for our determination on a statement of agreed facts or evidence. Calduwood also brings before us a bill of exceptions presenting certain questions relating to, or raised by, its demurrer and plea.

The facts are stated largely upon the basis of a statement of agreed evidence in the first case, virtually identical to what appears to be a statement of the same circumstances agreed upon in the second case, and upon documents reproduced in each record. There seems to be no significant dispute concerning the facts in either case.

The city's former dumping area was closed by court decree, effective July 1, 1969. On January 8, 1969, the city board of health assigned the locus (which seems theretofore to have been a gravel pit) as a public dumping ground. G. L. c. 111, § 150A (inserted by St. 1955, c. 310, § 1).[3] The statute, as it then read, provided for assignment of a dumping ground "subject to the provisions of any [zoning] ordinance . . . adopted . . . under" c. 40A. This limitation is still found in the 1970 form of § 150A (see fn. 3). On March 7, 1969, the abutters appealed to the department from this assignment. After hearing, the department (on June 10, 1969) modified the assignment by requiring (1) that it be "a sanitary landfill" and (2) that engineering plans be approved by the department. The petition for review, initiating the first case, was filed in the Superior Court on June 20, 1969.

By order of the court on November 26, 1969, the matter was remanded to the department to take further evidence

---

[3] Section 150A was amended by St. 1969, c. 515 (which contained an emergency preamble) to provide that no place should be maintained as a public dumping ground "unless such . . . site is located more than three hundred feet from any dwelling house." By St. 1970, c. 839, effective on November 26, 1970, ninety days after the approval of c. 839 on August 28, 1970, § 150A was amended to include within a newly defined term, "facility," such premises as "a sanitary landfill" and a "dumping ground." The 1970 amendment omitted the 300 foot provision mentioned in the quoted portion of St. 1969, c. 515.

concerning the effect of St. 1969, c. 515 (see fn. 3). The department (on March 16, 1970) reaffirmed its prior action (of June 10, 1969) and directed that "all actual [future] dumping . . . be restricted to areas . . . more than 300 ft. from any dwelling." The department stated, "The matter of zoning has already been referred to the Superior Court and any decision on that item would be resolved by the court." This statement obviously referred to the second case.

On March 6, 1969, the Northampton city council directed the city board of health to select a waste disposal site. At the next meeting (March 20) of the council, the city board of health by vote of both its then memebers[4] selected the locus as the waste disposal area (apparently reaffirming the earlier action on January 8, *supra*). On May 1, 1969, the city council appropriated funds. On June 23, the city took the locus by eminent domain for landfill refuse disposal purposes.

About July 6, 1969, the city board of health was advised by the building inspector that it would be required to obtain a permit to conduct a landfill refuse operation on the locus. Such an operation, by Calduwood, as contractor with the city ("under the supervision of the" city board of health) had been arranged in June, 1969. After a public hearing on July 28, two of three members of the city's board of appeals were in favor of granting the permit. The effect of the two-to-one vote was that the permit was denied because the "concurring vote of all the members of" the board of appeals was necessary to "decide in favor of the applicant [here the city board of

---

[4] The statements of agreed facts and evidence assert that the city board of health consisted of two lay members during the whole of 1969 and that Dr. Donald B. Rogers, a physician, had been a third member until about October 19, 1968. Northampton had not accepted G. L. c. 111, §§ 26A-26E (inserted by St. 1946, c. 268, § 2), which provided for the creation of a city health department. Statute 1883, c. 250, § 27, provides that elections to Northampton's board of health "shall be so made that one member, at least . . . shall be a physician." See as to the general provision on this subject, G. L. c. 111, § 26 (as amended by St. 1946, c. 268, § 1). In Northampton vacancies may be filled by the city council at any time.

health] on any matter upon which" the board of appeals was required to pass under the zoning ordinance. See Northampton zoning ordinance, § 4E, carrying out the requirement of G. L. c. 40A, § 19 (as amended through St. 1955, c. 349). The city board of health then filed the bill in equity (G. L. c. 40A, § 21) constituting the second case, asserting among other things that the zoning ordinance permitted a municipal use of the locus in a Residential A zone without any requirement that the city board of health obtain a permit.

1. We deal first with the questions of law reported to us in the second case, as set out in the margin.[5] The issues thus raised are disposed of by our answer to the first question.

Section 11 (Residence "A") of the zoning ordinance reads in part: "The Residence 'A' district shall include all the area of the city not included in any other district. In this district no building shall be erected for or altered for and no building or premises shall be used for any purpose except: . . . [then follows a list of uses including single family dwellings, churches, museums, libraries, educational use, professional use, farms and the like] (e) Municipal, recreational or water supply use." This provision we refer to hereafter as § 11 (e). After § 11 (e) are listed certain tourist homes and boarding houses, garage and parking space uses, and "(h) [t]elephone service buildings, provided . . . that the proposed or actual use does not include a storage yard or repair shop." Paragraph (i) of § 11 reads, in part (emphasis supplied), "(i) Any of the following uses, provided they are not injurious, noxious, or offensive to the neighborhood,

---

[5] These questions are: "1) May the [city b]oard of [h]ealth . . . operate, through a private contractor, a municipally owned and municipally controlled sanitary landfill site, solely for the benefit of the residents . . . of Northampton under the zoning ordinances?" See Northampton Ordinances, c. 44, § 11 (e). "2) Is the [city b]oard of [h]ealth . . . required to apply for a permit under . . . [§) 11 (i) 5 of the zoning ordinances of the City of Northampton for . . . [such] operation?" "3) May the [city b]oard of [h]ealth . . . operate . . . [such a] sanitary landfill site . . . only in a business or industrial zone, under the zoning ordinances?" See c. 44, §§ 14, 14A, 15, 15A.

and only if authorized by permit issued by the [b]oard of [a]ppeals after a public hearing. . . . [Then follows a list of uses such as clubs, hospitals, charitable institutions, sanatoriums, and customary home occupations.]   4. A storage yard for periods up to five years the permit for which may be renewed by the [b]oard of [a]ppeals after a public hearing if in the opinion of the board it is not injurious, noxious, or offensive to the neighborhood.   The storage yard shall be screened from view in a manner appropriate to the environment as determined by the [b]oard of [a]ppeals.   5. Aviation field, broadcasting station, cemetery, fur farm, golf club, country club, greenhouse, convalescent or nursing home, ice harvesting, and storage on the same premise, *municipal use,* outdoor movie theatre, stables, stone quarrying, gravel bank, sand bank, removal of topsoil, trailer camps, and overnight camps" (emphasis supplied).   Obviously, § 11 is obscure because of the careless duplication of the words "[m]unicipal . . . use" (1) in § 11 (e) as a use affirmatively permitted in a Residence A district (cf. *Harvard* v. *Maxant,* 360 Mass. 432, 435–436) and (2) in the requirement of a permit for such use in § 11 (i) 5.[6]

Zoning provisions, of course, should be interpreted in the context in which they appear. *Kenney* v. *Building Commr. of Melrose,* 315 Mass. 291, 295.   See also *Hodgerney* v. *Baker,* 324 Mass. 703, 706.   Dumps have been regarded as "offensive."   See *Building Commr. of Medford* v. *C & H Co.* 319 Mass. 273, 286.   Nevertheless, "[m]unicipal . . . use" is allowed expressly, without a permit, in § 11 (e).   We see no adequate basis for restricting the scope of the first use of that term in § 11 (e) either

---

[6] With these provisions must be read § 15 (c) of the ordinance relating to industrial use, which (in addition to allowing as of right uses allowed in all residence and in business "A" districts) allows (after approval by the board of appeals following a public hearing): "Incineration, reduction of or dumping of offal, garbage, or refuse *on a commercial basis,* except where controlled by the municipality. Junk yards and junk storage" (emphasis supplied).   We interpret this provision as an explicit authorization for, and requirement of, permits under § 15 (c) for commercial dumping and as having no application to municipally controlled use.

(1) by the inconsistent, and perhaps inadvertent, use of the same words in § 11 (i) 5, or (2) because of contentions that we should infer, from the general character of the other uses allowed by § 11 (without a permit) in a Residence A zone, that municipally owned sanitary landfills were not to be permitted in such a zone.[7] To give restrictive weight to the words "municipal use" in § 11 (i) 5 would mean that all municipal use (at least if not closely similar to other uses permitted by § 11 as of right) must have a permit. This interpretation would involve the city in constant uncertainty about which municipal uses were sufficiently like those permitted by § 11 to private persons as of right. It is hard to believe that such uncertainty was intended. It may be significant that, in various other sections of the ordinance (e.g. §§ 12 and 13, Residence B and C, respectively; § 14, Business; and § 15, Industrial), any use permitted in a Residence A zone (which, of course, includes "municipal use") is permitted as of right. Uncertainties about Residence A requirements thus might carry over to these other areas. In none of the sections of the ordinance just cited does there appear language differentiating among municipal uses.

This is not a case where the ordinance (§ 11) clearly and specifically requires a permit for a municipal use. Cf. *Sellors* v. *Concord,* 329 Mass. 259, 260–262. It more closely resembles *Pierce* v. *Wellesley,* 336 Mass. 517, 518–519, 523–524, where the town was permitted by its zoning by-law to maintain parking lots in residence areas and it was held that "the town reserved to itself . . . the privilege of carrying on town functions in any zone in the town."

---

[7] Photographs of the locus in evidence show it to be in a somewhat rural, sparsely settled area with few houses near it. We have little reason for thinking that the intention of the framers of the ordinance was to exclude such a use from this type of area. It should be noted that § 11 included in a Residence A zone "all the area of the city not included in any other district." This suggests that the city council may have been pursuing a policy of imposing maximum restriction, at least temporarily, by placing in a Residence A zone areas of the city, the future of which they then were not able or prepared to predict, at the same time trusting themselves not to place any inappropriate municipal use in such Residence A zone.

See *Sinn* v. *Selectmen of Acton*, 357 Mass. 606, 608–612 (local zoning by-law expressly provided, "Nothing in the by-law shall prohibit the development of any land in any district for municipal . . . use"); *Cameron* v. *Zoning Agent of Bellingham*, 357 Mass. 757, 762. See also *Gilmore* v. *Quincy*, 346 Mass. 22, 23–24 (municipal dump allowed in a "city property" zone which this court treated as wholly unzoned). The net effect of § 11 (e), when read with the other ordinance sections (already cited) which permit Residence A uses in most other zones, is much the same as the reservation to the town in the *Wellesley* case, 336 Mass. 517, 524, of the right to carry on municipal uses in any zone (unless, of course, § 11 [i] 5 is permitted to restrict § 11 [e]). We cannot know whether the Northampton zoning ordinance would have been adopted at all if the apparent allowance of "[m]unicipal . . . use" in Residence A zones had not been included in § 11 (e). Taking into account all parts of the ordinance and all the circumstances, we resolve the ambiguity in favor of the view that § 11 (e) of the ordinance allows any municipal use in a Residence A district (and, indeed, in any zone where Residence A uses are allowed without a permit).

We reject the contention that "[m]unicipal, recreational or water supply use" should be read as "[m]unicipal recreational or municipal water supply use." The comma after "[m]unicipal . . . use," we think, precludes any such reading of § 11 (e). See *Haynes* v. *Grasso*, 353 Mass. 731, 735.

What has just been said disposes of all three questions reported to us. Our holding, that § 11 (e) generally authorizes municipal uses in a Residence A district, directly answers the first and second questions (fn. 5) and makes unnecessary any detailed answer to the third question. The answer to the first question is "yes" and to the second and third questions is "no."

2. We next deal with those questions in the first case sufficiently argued in briefs to require any discussion. See S. J. C. Rule 1:13 (351 Mass. 738).

(a)  The assignment of the locus as a dumping site was valid even if there was a vacancy in the membership of the city board of health (see St. 1883, c. 250, § 27) and even if the board membership included no physician (see fn. 4, *supra*).   See G. L. c. 4, § 6, Fifth, which provides that, in construing a statute (unless repugnant to the context), "[w]ords purporting to give a joint authority to . . . three or more public officers . . . shall be construed as giving such authority to . . . a majority of such officers."  See *Cooke* v. *Scituate,* 201 Mass. 107, 109; *Albano* v. *Selectmen of South Hadley,* 341 Mass. 494, 496.   Cf. *Moran* v. *Secretary of the Commonwealth,* 347 Mass. 500, 504.

(b)  Even if St. 1969, c. 515, in fact ever applied to the assignment of the locus as a dumping ground, that now is of no consequence.   The department's reaffirming order of March 16, 1970, restricted dumping on the locus to areas more than 300 feet from any dwelling.   Chapter 515, even while in effect (between July 16, 1969, and November 26, 1970; see fn. 3, *supra*) made no reference to lot boundaries.  We interpret the 1969 statutory language (in the absence of clear indication to the contrary) as requiring only that the area actually used for dumping be more than 300 feet from any dwelling.   It thus is immaterial whether c. 515 applied to the locus as to which an appeal was still pending when c. 515 became effective, or whether the statute (St. 1970, c. 839) repealing the 300 foot provision had any retrospective effect.

(c)  No sufficient argument is presented that the department, at the original 1969 hearing and at the 1970 hearing after remand, did not have before it substantial evidence supporting its conclusions about the action of the city board.   In any event, the evidence and exhibits (documentary and photographic) clearly constituted such substantial evidence.

(d)  We assume that the department, subject to judicial review, could have considered and decided, at least for all purposes of G. L. c. 111, § 150A, as amended, whether (as matter of law) the Northampton zoning

ordinance required the city board to obtain a permit for the operation of a dump on the locus. The department, in view of the zoning litigation then pending in the second case, reasonably left decision of this legal issue to the Superior Court. As we have now in this opinion resolved that issue in a manner consistent with the department's decisions of June 10, 1969, and March 16, 1970, the department's postponement of decision of the issue is immaterial.

3. The demurrer to the bill in the second case [8] was properly overruled, and an amendment of the bill was properly allowed, on principles adequately discussed in *Carr* v. *Board of Appeals of Saugus, ante,* 361, 362–363. See *Richardson* v. *Zoning Bd. of Appeals of Framingham,* 351 Mass. 375, 376–377; *McLaughlin* v. *Rockland Zoning Bd. of Appeals,* 351 Mass. 678, 682; *Shaughnessy* v. *Board of Appeals of Lexington,* 357 Mass. 9, 12–14. The plea in abatement also was properly overruled for reasons already stated in part 2 of this opinion.

4. In the first case, the decree of the Superior Court (affirming the decision of the department) is affirmed. In the second case the exceptions are overruled. The questions reported to us in the second case are answered in the manner already stated in this opinion and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[8] The demurrer was based on the ground, among others, that there was not attached to the bill within the twenty-day appeal period a copy of the decisions appealed from, bearing the date of filing, and certified by the city clerk. An uncertified copy of the decision, however, was attached. A certified copy was substituted by the amendment referred to in the text of the opinion.