## ADOPTION OF HUGO.[1]

Suffolk. September 2, 1998. - October 14, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Minor,* Adoption. *Evidence,* Child custody proceeding, Expert opinion. *Witness,* Expert.

A Juvenile Court judge did not abuse his discretion in concluding that a child's best interests would be served by his adoption by his aunt rather than by his foster mother, and there was no merit to the claims that the judge gave "undue weight" to the plan proposed by the child's biological parents [225-226], that he inappropriately made a comparison of material opportunities that could be provided by the proposed adoptive parents [226-227], that he ignored expert testimony regarding the trauma of the child's separation from the foster parent [227-230], or that he failed to give adequate consideration to the child's sibling relationship in the foster home [230-231].

In a care and protection proceeding, the judge properly ruled that the parents' expert witness, a licensed clinical social worker with a master's degree and more than twenty years' experience, was qualified to testify and her testimony was properly admitted [232-234]; further, there was adequate support in the record for the judge's conclusion that the expert's testimony was based on a reliable methodology [234].

In a proceeding brought under G. L. c. 210, § 3, for care and protection, the judge properly may order an adoption plan different from that proposed by the Department of Social Services. [234]

Claims of error, individually or collectively, in an adoption proceeding did not constitute reversible error. [234-235]

PETITION filed in the Boston Division of the Juvenile Court Department on September 14, 1994.

The case was heard by *Stephen M. Limon,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Susan F. Drogin* for the father.

*Margaret M. Geary* for the mother.

[1]The names of the child, his sister, his foster mother, and his aunt are pseudonyms.

*Katherine M. Potter* for Department of Social Services.

*R. Susan Dillard,* Committee for Public Counsel Services (*Andrew L. Cohen,* Committee for Public Counsel Services, with her) for the child.

*Jacqueline Y. Parker,* for National Association of Counsel for Children, amicus curiae, submitted a brief.

MARSHALL, J. The Department of Social Services (DSS or department) and a minor child, whom we call Hugo, appealed from the rulings and order of a judge in the Boston Division of the Juvenile Court Department in a care and protection proceeding under G. L. c. 119, §§ 24-29, and G. L. c. 210, § 3. DSS had proposed that Hugo, now four years old, be adopted by his foster mother, with whom he has lived from the age of two. The judge, in what he described as a "heart-wrenching" decision, concluded that Hugo's best interests would be served by an alternative plan proposed by the parents that he be adopted by his paternal aunt, who lives in New Jersey. The Appeals Court reversed, ruling that the parents' "risk-laden" plan could not be supported when DSS had recommended an "advantageous, reasonable, and attainable plan of adoption." *Adoption of Hugo,* 44 Mass. App. Ct. 863, 868 (1998). We granted the parents' applications for further appellate review. We affirm the judgment of the Juvenile Court.

1. Hugo was born on September 11, 1994. On September 14, 1994, DSS filed a care and protection petition on Hugo's behalf, pursuant to G. L. c. 119, §§ 24-29, received temporary custody of him, and placed him in his first foster home. On August 16, 1995, DSS moved, pursuant to G. L. c. 210, § 3 (*b*), to amend its pleadings in order to dispense with both parents' need to consent to or receive notice of Hugo's adoption.

A hearing on the merits was held on October 13, 1995; neither parent was present. A judge in the Juvenile Court adjudicated that Hugo was in need of care and protection, committed him to the permanent custody of DSS, and dispensed with the consent of either parent to any adoption of Hugo subsequently sponsored by DSS. The judge also approved DSS's plan for Hugo to be adopted by his first foster mother. Hugo was thirteen months old at the time.

Hugo's biological parents took an appeal from that judgment, but in January, 1997, all parties executed a stipulation providing that the Juvenile Court judgment be vacated, that the matter be heard by another judge, and that separate counsel be appointed

for the parents.[2] Hugo was by then two years and four months old. In the interim, in August, 1996, DSS moved Hugo to a second foster home. DSS now proposed that Hugo be adopted by his second foster mother, Ms. L.

A second trial before another judge in the Juvenile Court was held between August 22, 1997, and December 1, 1997.[3] On February 25, 1998, the trial judge found Hugo in need of care and protection, found both parents currently unfit to parent Hugo, and granted DSS temporary custody of him. The same day the judge issued a decree dispensing with the consent of and notice to either parent of any petition for Hugo's adoption. Those rulings are not challenged.[4]

On March 3, 1998, the judge issued his order concerning Hugo's adoption, together with extensive written findings of fact and conclusions of law. He concluded that Hugo's best interests would be served by transferring custody of Hugo to his paternal aunt, Ms. J. He further ruled that the adoption plan propounded by DSS did not serve Hugo's best interests, but that, if Hugo's aunt was unable to accept custody of him, the DSS plan would serve his best interests. The judge gave DSS temporary custody of Hugo, and ordered that DSS work cooperatively to prepare a transition plan for him. He also ordered postadoption visitation between Hugo, his foster mother, and his biological sister.

2. We summarize the pertinent findings of the Juvenile Court judge, reserving for later discussion additional evidence and findings in connection with issues raised.

Hugo was placed in the custody of DSS three days after he

---

[2]In May, 1996, Hugo's first foster mother informed DSS that she was no longer interested in adopting him.

[3]During the eight-day trial, the judge heard extensive testimony from ten witnesses, including four DSS social workers; expert witnesses testifying on behalf of DSS, Hugo, and the biological parents; and Hugo's aunt, Ms. J. The judge also reviewed more than seventy exhibits, including investigative and other reports.

[4]The judge made extensive findings regarding each parent's unfitness to parent Hugo. Among other things, he found that the mother had a continuing pattern of neglecting her children, had failed to receive treatment for her mental health problems that included a diagnosis of chronic paranoid schizophrenia, had failed to deal with her substance abuse, and had not dealt with issues of domestic violence with the father. The judge also found that, among other things, the father's pattern of substance abuse, domestic violence, and neglect of his older child rendered him unfit to parent Hugo.

was born. He has never lived with either of his biological parents. At the time of his birth, DSS first attempted, unsuccessfully, to place Hugo in Ms. L.'s home with his biological sister, Gloria. Gloria was born in October, 1992, and has lived with Ms. L. since her birth.

In October, 1996, Ms. L. adopted Gloria. When DSS learned several months earlier that Hugo's first foster mother no longer wanted to adopt him, DSS persuaded Ms. L. to accept him as a foster child. Hugo moved permanently to Ms. L.'s home on August 17, 1996. In the interim, in July, 1996, DSS also learned that Hugo's paternal aunt, Ms. J., was interested in adopting him. At that time DSS made no effort to explore that alternative. In the subsequent months, DSS did take some steps to evaluate placement of Hugo with Ms. J., but the record is clear that DSS had determined that Ms. L. was the appropriate adoptive parent for Hugo.

Hugo is a child with special needs who faces physical, mental, and developmental challenges.[5] When he was one year old, Hugo was diagnosed with "failure to thrive," and at sixteen months he began receiving services from a child development specialist. At age two years, he began receiving early intervention services, including speech, physical, and occupational therapies, to address his developmental and physical delays. He has behavioral and emotional difficulties, displaying a low tolerance for frustration and difficulty with transitions. The judge found that Hugo needs a "consistent and predictable" environment.

At the time of the second trial, Hugo had lived in Ms. L.'s home for approximately one year. It is undisputed that he has bonded with her and calls her "mommy." Hugo has also bonded with his sister and derives important support from her, despite her young age. The judge found that Ms. L. regularly takes Hugo to the many appointments scheduled for his multiple special needs, but noted that there was no evidence that Ms. L. herself works to improve his speech or address his developmental delays. She does read to him.

Ms. L. derives her income from being a foster parent. While Hugo was living with her, Ms. L.'s two biological daughters, a biological granddaughter, and a foster child moved out of the

---

[5]His mother, who has a history of psychiatric illness, ingested cocaine during her pregnancy and tested positive for cocaine at the time of his birth.

home, and one foster child moved in. At the time of trial, Gloria, Hugo, and two other foster children were living in Ms. L.'s home. The judge inferred from the testimony that Ms. L. would continue to take foster children into her home, even if she adopted Hugo.[6]

As to the parents' proposed plan of adoption, the judge found that, in contrast to Ms. L., Hugo's aunt planned to spend "a lot of quality time with him and working in areas where he needs help." Ms. J. is forty-three years old. She was widowed in 1987, and now lives in New Jersey with her fiancé, her fifteen year old son, and her thirteen year old cousin, whom Ms. J. has raised as a daughter from infancy. She has been employed for many years by the New York police department, since 1980 as a police administrator's aide. Her fiancé is an electrician, a union member who has worked for the same company for over twenty years. Ms. J. has raised her own son. Since his birth he has had special needs and developmental disabilities, including a heart murmur, low birth weight, poor motor skills, speech delays, and visual difficulties that have required surgery. He has no behavioral problems. Although her son's school achievement is below average, his development has progressed over time.

The judge found that Ms. J. has been "heavily, consistently, and directly" involved in the treatment of her son. She has worked with him at home to reinforce the goals of his teachers and special needs providers. Ms. J. testified that she intends to do the same with Hugo. She has conferred with psychologists and service providers in New Jersey to determine the most appropriate educational placement for Hugo; the school psychologist, with whom she has a long-term relationship, is available to provide additional assistance with Hugo, if needed. Ms. J. is close to her own mother and her siblings and maintains a close relationship with her mother-in-law, a certified social worker and elementary school teacher. The judge found, based on her testimony and demeanor, that Ms. J. had the "track record, talent, capability and desire" to address Hugo's special needs, improve his development, and be a strong advocate for him.

The judge credited the expert testimony of two witnesses testifying on behalf of DSS and Hugo that Hugo is a fragile child for whom transitions are difficult; that he recovered from the disruption of the move from his first foster home; and that,

---

[6]Neither DSS nor Hugo challenges that inference.

were he to move to New Jersey, he would lose a stable and structured environment that is important to him. He also credited the testimony of the DSS expert that a child may be helped to compensate for, and adjust to, loss. He credited the testimony of Barbara Beardslee, an expert for the parents, that Hugo is attached to Ms. L. and to Gloria, that these attachments are predictive of his ability to form future attachments, and that where such an attachment is disrupted, a child typically will go through a period of adjustment and might display behavioral disturbances, but that steps could be taken to assist a child through this process. He also credited her testimony that, as Hugo advances to the age of formal schooling, it will be important to minimize his developmental deficits so that he can interact with peers and teachers to optimize his continuing growth and development.

The judge concluded that, while Ms. L. is a caring and loving professional foster parent, she has no record of accomplishment similar to Ms. J.'s, which he determined is "critical" to Hugo's future. He ruled that the trauma of Hugo's removal from Ms. L. was outweighed by the long-term benefits of moving him to a family better able to help him address his developmental challenges.

3. In proceedings to dispense with parental consent to adoption and the award of permanent custody to a nonbiological parent, we require that a judge make specific and detailed findings demonstrating that close attention has been given to the evidence. Subsidiary findings, in turn, must be proved by a fair preponderance of the evidence. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). When a judge complies with these mandates, we do not disturb his findings unless they are clearly erroneous.

DSS and Hugo do not challenge the trial judge's subsidiary findings of fact.[7] See *Adoption of Carlos*, 413 Mass. 339, 351 (1992). Rather, they take issue with his ultimate ruling, claiming that he "ignored" certain testimony and legislative or policy preferences, and improperly "emphasized" other evidence. In the main their arguments simply reflect dissatisfaction with the judge's "weighing of the evidence and his credibility determinations." *Adoption of Quentin, supra* at 886 n.3, citing *Custody of Eleanor*, 414 Mass. 795, 799 (1993), and cases cited.

---

[7]The Appeals Court also did not "quarrel with the detailed findings of fact made by the trial judge and the credit and weight he gave to the evidence that came before him." *Adoption of Hugo*, 44 Mass. App. Ct. 863, 866 (1998).

Once the judge concluded that parental unfitness was established, he correctly determined that the central question was whether it was in Hugo's best interests to remain with his foster mother or to be transferred to the care and custody of his aunt. G. L. c. 210, § 3 (c). The "best interests of a child" is a question that presents the trial judge "with a classic example of a discretionary decision." *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975). We recognize that in this field it is neither possible nor desirable to make decisions with precision, and that "much must be left to the trial judge's experience and judgment." *Id.*, quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975). It is for this reason, as the Appeals Court also recognized (*Adoption of Hugo*, 44 Mass. App. Ct. at 865), that our attitude toward a trial judge's decision in a custody appeal is one of substantial deference. See *Custody of Two Minors*, 396 Mass. 610, 618 (1986); *Adoption of a Minor (No. 2), supra*; *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra*. Particularly where, as here, close scrutiny of lay and expert witnesses was central to the judge's decision, our task is not to decide whether we, presented with the same facts, would have made the same decision, but to determine whether the trial judge abused his discretion or committed a clear error of law. See *Adoption of Paula*, 420 Mass. 716, 730 (1995) ("[w]e do not sit as a trial court to review de novo the evidence presented by the parties"); *Custody of Eleanor, supra* at 802 (appellate review "is not done to assess the evidence de novo, but rather to determine whether the judge's findings were clearly erroneous"); *Adoption of Adam*, 23 Mass. App. Ct. 922, 924 (1986) (question is not "whether we would have made the same findings on the evidence that the judge did").

It is entirely appropriate that we adhere to that standard of review. For if we afford great deference to a trial judge's decision when a biological parent's fundamental and constitutionally protected right to retain custody of her child is at risk, surely the trial judge's decision is entitled to the same deference where, as here, his determination does not implicate any such right. We consider the claims of DSS and Hugo in light of this standard.

(i) DSS argues that the judge abused his discretion by giving "undue weight" to the biological parents' proposed plan of

adoption. The claim is without merit. General Laws c. 210, § 3 (c), requires a trial judge to "consider the plan proposed by the department or other agency initiating the petition." Judges also "consider parental nominations of caretakers in an extended family, just as they do in other types of child custody cases." *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 62, 69 (1986). We agree with the Appeals Court that a plan proposed by a parent is not "entitled to any artificial weight in determining the best interests of the child." *Id.*[8] There is nothing in the record indicating that the judge afforded either the parents' or DSS's plan any presumptive or artificial weight. Rather, the judge obviously considered both plans carefully, and appropriately sought to determine which plan was in the child's best interests.[9]

(ii) DSS argues that the judge was improperly influenced by material or educational benefits Ms. J. can provide for Hugo, and that he "elevated" these considerations over the harm that Hugo would suffer if he is moved to New Jersey. DSS anchors its claim on its observation that the judge made twenty-two separate findings regarding Ms. J., and made but three findings regarding Ms. L.[10]

A judge's custody decision must not be based on "inappropriate factors, such as disapproval of a parent's life-style or a comparison of the material opportunities a foster parent may offer with those offered by a natural parent." *Care & Protection*

---

[8]Nor is a plan proposed by DSS entitled to any special weight, even if an alternative plan does not implicate the fitness of the biological parents. A judge should provide an "even handed" assessment of all the facts surrounding both the department's plan and any competing custody or adoption plan. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 261-262 (1978); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 62, 69 (1986).

[9]DSS argues that when both biological parents are unfit, a judge should employ a "higher" standard to justify removing a child from a preadoptive parent to whom he has become attached. The parents, in turn, argue that they had a "constitutional" right to nominate a substitute caretaker for their child since they are unfit to care for him themselves. Neither claim has merit. Presented with more than one potential adoption placement, the judge's task is to determine which plan will serve the best interests of the child, not to afford any particular weight to either plan. G. L. c. 119, § 26 (4). G. L. c. 210, § 3. *Care & Protection of Three Minors*, 392 Mass. 704, 714-715 (1984).

[10]DSS also points out that the judge included a reference to Ms. J.'s ownership of her home, a description of her home, and a description of her and her fiancé's employment histories and salaries. It notes that he observed that Ms. L. derives her income from foster care.

*of Three Minors*, 392 Mass. 704, 712 (1984), citing *Custody of a Minor*, 389 Mass. 755, 766-767 (1983). Here, the judge expressed no such disapproval, nor is there any basis to conclude that he endorsed the parents' plan of adoption because of any purported material advantage that Hugo's aunt might provide for him.[11] Rather, the judge appropriately considered the personal, educational, psychological, and other support available to each prospective parent to address Hugo's needs.[12] As to his finding that Ms. L. derived her income from foster care, the judge appropriately took note of disruptions within the foster family that Hugo had experienced and might continue to experience as foster children enter and leave Ms. L.'s home, a relevant matter in light of the expert testimony that Hugo needs a consistent and predictable home environment.[13] See *Petition of Catholic Charitable Bur. of the Archdiocese of Boston to Dispense with Consent to Adoption*, 395 Mass. 180, 187 (1985) ("evidence supported the judge's conclusion that the best interest of the child necessitated his living with a parent or parents who were able to contribute to his continued positive development").

(iii) DSS and Hugo argue that the trial judge ignored expert testimony that Hugo will be harmed if he is separated from his foster mother and sister, and failed to give appropriate consideration to Hugo's "paramount" interest in being raised in his present, stable environment.[14]

---

[11]Hugo's foster mother, Ms. L., did not testify. DSS claims that it does not require foster parents to testify to protect their privacy and to avoid the "chilling effect" this would have on its ability to recruit and maintain foster and adoptive homes. We express no view as to this claim. The judge had the benefit of Ms. J.'s lengthy and direct testimony, and did not have the benefit of Ms. L.'s testimony. He cannot be faulted for failing to make findings about Ms. L. and the resources she might have to address Hugo's developmental needs at home when little evidence to that effect was introduced.

[12]General Laws c. 210, § 6, requires the judge to be satisfied that one who petitions for adoption be of "sufficient ability to bring up the child and provide suitable support and education" before he issues a decree of adoption. Had the judge not ascertained whether Ms. J. had the ability to provide suitable support and education for Hugo, he would have been less than diligent.

[13]The Appeals Court observed that Hugo is "peculiarly unable to cope with change in his life." *Adoption of Hugo*, *supra* at 867. It appears not to have considered relevant the comparative instability of Hugo's foster home, with children becoming part of the family and then leaving.

[14]DSS relies on *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 136 (1990). *Gwendolyn* is inapposite, for in that case the alternative to adoption of the

The judge explicitly considered the expert testimony regarding the trauma of separation for Hugo.[15] He recognized that moving Hugo from his present foster home and its attendant network of supports "would cause yet another difficult transition" for Hugo. He made findings, not disputed by DSS or Hugo, that there were ways to help Hugo "compensate for and adjust to" his loss, noting that Hugo had successfully formed a new attachment to Ms. L. after leaving his first foster mother.[16] The judge's conclusion that the benefit of keeping Hugo with Ms. L., "avoiding the trauma of the loss of these supportive people," was outweighed by the long-term benefit of moving him "into a family of relatives who will be better able to help him meet his potential," was supported by specific and detailed findings demonstrating his close attention to the evidence. See *Adoption of Quentin*, 424 Mass. 882, 886 (1997); *Adoption of Frederick*, 405 Mass. 1, 10 (1989) (trial judge is "in the best position to assess the credibility of the witnesses' testimony and determine the weight afforded it").

Stability in the life of a child, especially one as young as Hugo, is important, as the judge himself recognized. *Custody of*

child by her foster parents was that the child, "in all likelihood, will spend her childhood in temporary arrangements that inevitably lack the security and stability that an advantageous adoption can provide." *Id.* Here the alternative adoption plan provides a stable home for Hugo. DSS also argues that Hugo's aunt, as a member of his biological family, is not entitled to any "priority" over Hugo's current placement with his biological sister. We agree, but see no evidence that the judge engaged in any sort of "prioritization" of the respective familial or biological interests.

[15]The judge credited the testimony of a DSS expert that, "[i]f custody of [Hugo] were to be transferred to [Ms. J.], [Hugo] would suffer the loss of a stable, structured environment — his caretaker, his sister, and the people in his school. The predictable result would be some tantrums, 'perhaps some depression, certainly some regression, tremendous mourning as part of that depression.' " He also credited the testimony of Hugo's expert that "[i]f [Hugo] were to move to New Jersey to live with [Ms. J.], he would go through a period of bereavement that would include a phase of protest and outrage, as well as a phase of despair and withdrawal, which is the normal grieving process."

[16]The Appeals Court observed that Hugo's developmental progress "would stall" and that "he would regress upon separation from [his foster mother] and his sister." *Adoption of Hugo, supra* at 867. The Juvenile Court judge took evidence to that effect into account. But he also took into account whether the separation would have long-term effects, and the unchallenged expert testimony that a child like Hugo could compensate for and recover from the trauma.

*Two Minors*, 396 Mass. 610, 617 (1986).[17] Here, the judge had to weigh the benefits of stability, of keeping Hugo in his present home, with moving him to a family where, in his judgment, it is more likely that Hugo will receive the home support, stability, and reinforcement of efforts to address his developmental needs so critical to his future development.[18] The judge also took into account whether Hugo's present home itself will provide a stable environment for him. As the trier of fact, he was in the best position to evaluate all the evidence, contradictory at times. See *Custody of Eleanor, supra* at 799-800; *Care & Protection of Martha*, 407 Mass. 319, 328 (1990), quoting *Care & Protection of Three Minors, supra* at 711.

We recognize that separating Hugo from his foster family will have negative consequences for him, although the experts

---

[17]The Legislature has recognized that one factor to take into account in connection with a finding of parental fitness is that, "because of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker; the bond has existed for a substantial portion of the child's life; the forced removal of the child from the caretaker would likely cause serious psychological harm to the child; and the parent lacks the capacity to meet the special needs of the child upon such removal." G. L. c. 210, § 3 (*c*) (vii). The Appeals Court concluded that when "there is no biological parent tugging at the other end of the rope," the reasons "for severing the bond that the child has established with the substitute caretaker must . . . have exceptional force." *Adoption of Hugo, supra* at 867. We do not agree. The statute addresses conflicts between a biological parent and a substitute caretaker. When the choice is between two caretakers, each of whom seeks to be the substitute for the child's biological parents, a judge may consider a wide range of permissible evidence in determining which placement will serve the child's best interests. In some cases, the importance of leaving a child in the home of his substitute caretaker may be the most important determining factor. In others, there may be evidence that pulls in a different direction. It is for the trial judge to determine the weight of the evidence; we do not require that any evidence be established with exceptional force.

[18]The Appeals Court termed the plan that Hugo be adopted by his aunt "speculative." Any custody or adoption decision necessarily requires "predictions as to the possible future development of a child." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975). In that sense any decision to move a child to a new family is necessarily speculative, for there can never be conclusive evidence that his future will be as predicted. Here the Juvenile Court judge made uncontested "extensive, careful findings," *Adoption of Hugo, supra* at 864, after eight days of proceedings, throughout which he displayed "care and patience." *Id.* at 865. The judge had good reason to conclude that Hugo would more likely reach his greatest potential by living with his aunt than he would by remaining with his foster mother.

disagree as to the long-term effects of those consequences. While judgments in these cases are immensely difficult, we cannot say that avoiding the trauma of separation had to be the determining factor for the judge. See *Care & Protection of Three Minors, supra* at 716, citing *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984) (although separation of child from her foster home "would be psychologically devastating," it was "error to base the allowance of a petition to dispense with consent to adoption only on the fact that the child would be hurt by being returned to the natural parent"). We noted in the *Three Minors* case that "[t]oo often the claim that bonding justifies adoption is the result of a self-fulfilling prophecy." *Id.* at 716 n.18. In effect, the argument is that whenever a child has bonded with his foster family, adoption presumptively must be awarded to that family if the alternative placement is not with a biological parent. Previously we have not thought it advisable to recognize such a presumption. We do not think it advisable to do so here. The Appeals Court described the "case" for DSS as confirming a custodial arrangement that was not "broke," and that it would be a mistake to "fix it." *Adoption of Hugo, supra* at 865. Implicit in that description is a presumption in favor of Hugo's present placement. There are times when the best interests of a child warrant "fixing" his custodial arrangement. Here the judge found that, while Ms. L. was a loving parent, there was no evidence that she had the talent or capacity to respond to Hugo's developmental needs that his aunt demonstrated. The judge's findings are not challenged. That Hugo has "done well" in his foster home, *id.* at 864, is not reason enough to deny him the opportunity to do his very best, even if that opportunity is untested.

(iv) DSS and Hugo take exception to what they claim was the judge's failure to give adequate consideration to Hugo's sibling relationship with Gloria. They urge us to recognize a general presumption in favor of maintaining a sibling relationship in custody cases.

"The courts of this Commonwealth have recognized the importance of siblings' being raised together." *Care & Protection of Three Minors, supra* at 715, and cases cited. But we have been careful to observe that a sibling relationship is but one factor, albeit an important one, that a judge should consider in custody cases. See *Care & Protection of Three Minors, supra*

(even where siblings spent time together and expressed desire
to live together, sibling relationship is not dispositive). Siblings
who are separated from their biological parents no doubt play
an important role in each others' lives. See *id.* at 714-715. In
this case, Hugo and Gloria have never lived with their biologi-
cal parents[19]; their attachment to each other was formed when
Hugo was placed with the family that adopted his biological
sister. The judge carefully considered Hugo's relationship with
Gloria and the impact of his separation from her.[20] He ultimately
determined that, important as that relationship is, Hugo's adop-
tion by his aunt would be in his best interests. We are not
persuaded in this complex area of familial relationships that the
judge should have given presumptive weight to the sibling
relationship. Rather, we adhere to our view that in child custody
cases the best interests standard mandated by G. L. c. 210, § 3,
is "a flexible one," and the weight to be accorded its several
considerations, including the importance of sibling relations,
"will vary with the circumstances." *Petition of the New England
Home for Little Wanderers, supra* at 644.[21] We find no legal er-
ror on these grounds in the judge's ruling.

[19]In *Care & Protection of Three Minors*, 392 Mass. 704, 715 (1984), we
said that it has "been our policy to keep children within the natural family
whenever possible." The Legislature has recognized the same goal of "the
strengthening and encouragement of family life for the protection and care of
children; to assist and encourage the use by any family of all available
resources to this end; and to provide substitute care of children only when the
family itself or the resources available to the family are unable to provide the
necessary care and protection to insure the rights of any child to sound health
and normal physical, mental, spiritual and moral development." *Id.* at 715
n.16, quoting G. L. c. 119, § 1. As the parents are unfit, and because Hugo
and Gloria have never lived with them, this policy is not implicated.

[20]He found that "[i]t is undisputed that [Hugo] has bonded . . . to his
biological sister [Gloria], to whom he goes for support, and who translates for
him when his speech is unclear." He also acknowledged that "[Hugo] and
[Gloria] have a very positive relationship. They get along well. [Gloria], the
older sister, is protective of him, attuned to him, and helps him through his
difficulties." The judge also found that "[Hugo] is significantly attached to
[Ms. L.] and to his sister, and that attachment is a firm, positive foundation for
him. . . . [Hugo] interacts with [Gloria], both as a peer and for support. She
helps him when they play, and serves as a resource to solve problems when he
gets frustrated."

[21]In *Ardizoni* v. *Raymond*, 40 Mass. App. Ct. 734, 738 (1996), the Appeals
Court said that "[t]he list of factors within the judge's purview in child
custody matters includes a presumption generally favoring the placement of
siblings under one roof." That case concerned a custody dispute arising from
a judgment of divorce. A judge in the Probate and Family Court had separated

4. Hugo challenges both the qualifications and the reliability of the methodology of the parents' expert witness, Barbara Beardslee.[22] See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994). The admission of expert testimony is "largely within the discretion of the trial judge and will be reversed only where it constitutes an abuse of discretion or error of law." *Commonwealth* v. *Pikul*, 400 Mass. 550, 553 (1987). See *Commonwealth* v. *Richardson*, 423 Mass. 180, 183 (1996); *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 642 (1997). There was no error in admitting Beardslee's expert testimony.

We consider first Beardslee's qualifications. " 'The crucial issue,' in determining whether a witness is qualified to give an expert opinion, 'is whether the witness has sufficient "education, training, experience and familiarity" with the subject matter of the testimony.' " *Commonwealth* v. *Richardson, supra* at 183, quoting *McLaughlin* v. *Selectmen of Amherst*, 422 Mass. 359, 361-362 (1996). See *Commonwealth* v. *Goetzendanner, supra* at 642 (no error to qualify witness with bachelor's degree in psychology and ten years' experience in field of domestic violence to give expert testimony about general characteristics of battered women's syndrome). Beardslee is a licensed independent clinical social worker[23] with a master's degree in social work and more than twenty years of experience working

the parties' identical eleven year old twins, and had awarded each parent physical custody of one child. Prior to that time, the twins had lived together. The Appeals Court also said, correctly, that a decision concerning a child's best interests is within the discretion of the judge, allowing the judge "to consider the widest range of permissible evidence, including the reports and testimony of a court appointed investigator or [guardian ad litem], evidence of the history of the relationship between the child and each parent, evidence of each parent's present home environment and over-all fitness to further the child's best interests, and the judge's own impressions upon interviewing the child privately in chambers." *Id.* We do not take issue with the result in *Ardizoni*, but adhere to our view that, in considering the "widest range of permissible evidence," a judge should not give presumptive consideration to one factor or another. The Legislature has not recognized a presumption as such. General Laws c. 119, §§ 23, 26, as amended through St. 1997, c. 43, §§ 98, 99, provides for visitation between siblings placed in different foster or preadoptive homes or with different family members "whenever reasonable and practical, and based upon a determination of the best interests of the child."

[22]At trial both Hugo and DSS objected to the admission of Beardslee's testimony.

[23]General Laws c. 112, § 130, defines the "practice of social work," in part, as providing services involving "the application of social work theory

with children and families. At the time of trial, she was employed as a staff clinician by Massachusetts General Hospital's Children and the Law Program, where she had conducted approximately eighty court-appointed evaluations involving issues of custody and visitation and had made decisions regarding the disposition of minor children in the context of adult and parental disputes. She also teaches and supervises students in that program. Previously, Beardslee was employed by the Boston Juvenile Court Clinic, where she provided court evaluations of, and court reports about, children. Beardslee has participated in numerous training and continuing education programs, and she conducts a private practice evaluating and treating children and their families.[24] The judge found Beardslee qualified as an expert "in the area of child psychology."

Hugo argues that Beardslee was not qualified to give expert testimony in this case because she possessed no "clinical familiarity" with the special circumstances of "foster children, placement disruptions, adoption issues, child development, three-year-old children, sibling relationships, loss and grief and child psychology." Hugo ignores Beardslee's extensive experience in working with children and families, and focuses too narrowly on the specific facts of this case. "There is no requirement that testimony on a question of discrete knowledge come from an expert qualified in [a] subspecialty rather than from an expert more generally qualified." *Commonwealth* v. *Mahoney*, 406 Mass. 843, 852 (1990), citing *Letch* v. *Daniels*, 401 Mass. 65, 68 (1987). See *Adoption of Kirk*, 35 Mass. App. Ct. 533, 540 (1993) (social worker permitted to testify concerning father's psychiatric history); *Custody of Michel*, 28 Mass. App. Ct. 260, 265 (1990).

Experience with adoptive and foster children might have

and methods in the prevention, treatment, or resolution of mental and emotional disorders or family or social dysfunctioning." Section 130 also authorizes social workers to engage in "psychotherapy of a nonmedical nature," defined as "the utilization of psychological and interpersonal theories and related practice methodologies to assess, interpret and modify conscious and unconscious processes of behavior."

[24]Beardslee testified that in her private practice, which she has conducted since 1980, she typically treats children who are "experiencing behavioral disturbance, troubles in school, troubles with peers, sadness around loss, adjustment problems, families, [and] problems related to family events." She testified that "family events" included "mov[ing] to a new community, [the] loss of [a] family member by death, [or] by accident," and "a lot of work with families who are involved in divorce."

been helpful, but it was not essential. The dispute here concerns two prospective adoptive parents. Beardslee's extensive experience evaluating beneficial placements for children in custody and visitation disputes seems particularly appropriate. The trial judge concluded that Beardslee had sufficient education, training, experience, and familiarity with the relevant issues in this case to be qualified as an expert witness. We see no basis on which to conclude that he abused his discretion. See *Murphy* v. *Chichetto*, 323 Mass. 11, 15 (1948), and cases cited (decision regarding expert's qualification rests largely in discretion of trial judge).

Hugo also challenges the reliability of Beardslee's methodology, urging us to require that an expert establish reliability in one of only five ways: (1) by proving it is generally accepted in the community; (2) by testing; (3) by peer review and publication; (4) by showing that the analytical process has established validity; or (5) by the use of an accepted, standard methodology. See *Lanigan, supra* at 24-26. There is no such requirement. Beardslee testified that, in addition to the knowledge gained from her own training and experience, she had reviewed the case file, interviewed the parties, and gathered information from service providers, a methodology strikingly similar to that used by DSS's and Hugo's own experts. There is adequate support in the record for the judge's conclusion that Beardslee's testimony was based on a reliable methodology.

5. DSS and Hugo claim that the judge committed an error of law by requiring DSS to sponsor an adoption plan it does not support. We adopt the reasoning of the Appeals Court, and conclude that a trial judge may properly order a plan different from the one proposed by DSS in proceedings brought under G. L. c. 210, § 3. *Adoption of Hugo*, 44 Mass. App. Ct. at 866.

6. In "either an adoption or a custody proceeding, the department enjoys virtually unrestricted discretion in determining matters of parental fitness and child custody." *Care & Protection of Three Minors, supra* at 717. But the exercise of that discretion is subject to judicial review. In this case, the department's representatives conducted their responsibilities professionally, searching to find an appropriate adoptive family for Hugo. Hugo's foster mother, in turn, has provided love and comfort to a child sorely in need of protection. In the end, however, DSS and Hugo point to nothing in the judge's decision that warrants reversal. We have examined the record as a

whole and reviewed each separate challenge to the judge's conclusions. The claims of error, individually or collectively, do not constitute legal error.

The judgment of the Juvenile Court is affirmed.

*So ordered.*