NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-465

ADOPTION OF TAYLOR.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a two-day trial, a judge of the Juvenile Court found the father unfit to parent Taylor, terminated his parental rights, and found the adoption plan of the Department of Children and Families (department) to be in Taylor's best interests.  On appeal, the father contends that the judge (1) abused her discretion in finding that the department made reasonable efforts to unify him and Taylor, (2) erred in not considering his proposed kinship placement, and (3) violated his due process rights at trial.[2]  We affirm.

---

[1] A pseudonym.

[2] The mother, whose parental rights the judge also terminated, is not a party to this appeal.

Background. We summarize the judge's findings of fact, supplemented by undisputed facts in the record.[3]

In June 2023, on the same day that Taylor was born, the department received a report under G. L. c. 119, § 51A, alleging neglect of Taylor by her mother after Taylor tested positive for amphetamines, benzodiazepines, cocaine, fentanyl, and methadone. The department obtained temporary custody of Taylor the following day. Due to her prematurity and medical needs, Taylor remained in the hospital for about three months, after which she was placed in the home of her preadoptive family.

Taylor's mother did not identify Taylor's father until sometime between June 2023 and September 2023, though the judge found that the father learned he could be Taylor's father either in or before August 2023. The father was subsequently assigned counsel and commenced a paternity action.

At the time the father commenced his paternity action, he was serving a seven-year State prison sentence after having pleaded guilty to four firearms offenses, including carrying a loaded firearm without a license and possession of a large capacity firearm. After initially connecting with the father in

_____

[3] The trial judge made ninety-three findings of fact, and the findings "demonstrate that close attention has been given the evidence." Custody of Eleanor, 414 Mass. 795, 799 (1993).

2

October 2023, a social worker tried contacting the father multiple times while he was incarcerated, without success. In May 2024, the father returned her call. Although the father's paternity test results revealed in late June 2024 that he was Taylor's biological father, the department did not offer parent-child visits to or provide an action plan for the father because he was not adjudged Taylor's father until September 2024. At the time of trial, the father had not met Taylor.

The permanency goal for Taylor changed to adoption in October 2023. The department said that its plan was to complete a "family find" search for Taylor's paternal relatives after the father was adjudged Taylor's father.[4] In the meantime, Taylor's foster parents expressed interest in adopting Taylor. The department proposed, and Taylor (through counsel) supported, that Taylor be adopted by her foster parents. Alternatively, the father proposed that his mother take custody of Taylor until his release from incarceration. The department had contacted Taylor's paternal grandmother, after Taylor's mother identified the father as the probable biological father but before any paternity testing; the paternal grandmother stated that "she wished to be considered as a placement."

---

[4] The department completed a "family find" search for Taylor's maternal relatives, but no relative came forward to serve as a placement option.

A trial on the merits of the department's request to terminate parental rights of both the mother and the father commenced on June 14, 2024. Although the mother did not appear, the father appeared and was represented by counsel. Because his paternity test was still pending when trial began, the father filed an emergency motion to continue the trial, and to leave the evidence open to allow the submission of the paternity results once available. The trial continued for a second day on September 12, 2024, at which time the father was adjudged Taylor's father. Following trial, the judge issued a decree on September 20, 2024, terminating the father's parental rights and endorsing the department's adoption plan. This appeal followed.

Discussion. 1. Father's proposed kindship placement. The father, who does not challenge the judge's finding of unfitness, contends that the judge erred by not considering Taylor's paternal grandmother as a kinship placement. We disagree.

After finding a parent unfit, the judge is required to assess all placement plans and "determine which placement will serve the best interests of the child." Adoption of Dora, 52 Mass. App. Ct. 472, 475 (2001). The judge's assessment of each plan must be "even handed," regardless of which party offered the plan. Adoption of Hugo, 428 Mass. 219, 226 n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034

4

(1999).  "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of substantial deference" (quotation and citation omitted). Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017).

Here, the judge found the department's adoption plan "superior" to the father's proposal that his mother have custody of Taylor.  In assessing the father's proposed plan, the judge considered the lack of relationship between the paternal grandmother and Taylor; Taylor and paternal grandmother had met only once, in July 2024, during a visit with Taylor's foster parents.[5]  Moreover, the judge found no evidence that the paternal grandmother "is currently willing to have custody of [Taylor]" or that she is a "suitable guardian."  Paternal grandmother was expected to testify on the second day of trial, but she did not appear.

In contrast, the judge found that Taylor has a strong bond with her preadoptive family, including her preadoptive parents,

---

[5] The department did not offer the paternal grandmother visits with Taylor prior to the father establishing his paternity, but a social worker testified at trial that there were no concerns with the paternal grandmother having contact with Taylor.

5

whom she calls "dada" and "mama," and foster siblings.[6]  Taylor has been placed with the same family since she was discharged from the hospital in September 2023.  Taylor's preadoptive parents visited her at the hospital every day from August 16, 2023, until she was discharged to their home.  The judge also found that Taylor's preadoptive parents are committed to meeting Taylor's extensive medical and developmental needs.

Considering all the facts before her, the judge contemplated both plans and acted within her discretion in determining that adoption by the foster family was in Taylor's best interests.

2.  Reasonable efforts.  The father argues that the judge abused her discretion in finding that the department made reasonable efforts to unify Taylor and the father even before the father was adjudged to be Taylor's biological father.  Because the father did not raise this claim in the trial court, it is now waived.  See Adoption of Mattis, 106 Mass. App. Ct. 548, 550-551 (2026).  "Generally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances."  Adoption of Mary, 414 Mass. 705,

_____

[6] The judge credited the preadoptive parents' testimony that they are willing to support contact between Taylor and her paternal relatives, including her father and grandmother, so long as doing so is in Taylor's best interests.

6

712 (1993).  No such circumstances exist here.  Accordingly, we decline to reach the father's reasonable efforts argument.

3.  Due process rights.  The father argues, for the first time on appeal, that his due process rights were violated when the judge relied on evidence presented on the first day of trial to terminate the father's parental rights and did not allow the father the opportunity to cross-examine witnesses.  Because the father did not raise this argument in the trial court, it is waived on appeal.  See Adoption of Mary, 414 Mass. at 712.  We note, however, that the father likely did not raise this argument because he was represented by counsel on the first day of trial.  In fact, his attorney did cross-examine the first witness, and she declined the opportunity to cross-examine the two other witnesses who testified that day.  The record flatly contradicts the father's assertion that the judge "shut[] down Father's ability to confront" witnesses on either day of trial.

Decree affirmed.

By the Court (Massing, Neyman & Smyth, JJ.[7]),

Clerk

Entered:  April 6, 2026.

---

[7] The panelists are listed in order of seniority.