## ADOPTION OF KEEFE.[1]

No. 99-P-1923.

Suffolk. April 6, 2000. - August 10, 2000.

Present: BROWN, GREENBERG, & GELINAS, JJ.

*Evidence,* Expert opinion, Child custody proceeding. *Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption.

In a proceeding to dispense with a mother's consent to adoption, a judge of the Boston Juvenile Court correctly admitted expert testimony concerning the mother's affliction with Munchausen Syndrome by Proxy (MSBP) [823-824], but erred in admitting evidence about MSBP that constituted improper "profile" testimony [824]; in any event, extremely strong independent evidence of abuse supported the judge's conclusion that the mother was unfit [824-826].

PETITION filed in the Boston Division of the Juvenile Court Department on December 11, 1996.

The case was heard by *Mark E. Lawton,* J.

*Harold Robertson* for the mother.

*Alexander G. Gray, Jr.,* Assistant Attorney General, for Department of Social Services.

*Joseph J. Mazza* for the child.

GREENBERG, J. Keefe's mother, a licensed practical nurse, appeals from a 1999 decree of the Boston Juvenile Court dispensing with the need for her consent to his adoption. These proceedings result from a report of suspected child abuse filed pursuant to G. L. c. 119, § 51A (51A report), by a Massachusetts General Hospital (MGH) pediatrician who treated Keefe in November of 1996.

---

[1]As is our custom, we use a pseudonym. Keefe's mother and father were divorced in 1991. The father resides in California and did not enter an appeal. As reflected in the docket entries, Keefe originally was an appellant. New and present appellate counsel was allowed to withdraw Keefe's appeal; he proceeds as an appellee.

The mother complains that the medical evidence presented by the Department of Social Services (department) did not prove her unfit in the requisite clear and convincing manner and that the judge improperly admitted and utilized profile evidence to fix blame on her for Keefe's long-term illness, hospitalizations, and surgeries. In particular, she protests that expert testimony submitted by the department over her objection regarding Munchausen Syndrome by Proxy (MSBP)[2] so influenced the judge's consideration of the case that the decision to terminate parental rights cannot stand. She also objects to a "hearsay" statement and the judge's failure to mention the testimony of three witnesses in his findings. We conclude that the evidence is sufficient to support, clearly and convincingly, "the grave conclusion of unfitness." *Adoption of Katharine*, 42 Mass. App. Ct. 25, 27 (1997).

We sketch the unusual background facts as determined by the judge and supplemented by minor undisputed evidence. On May 11, 1990, at six months of age, Keefe was hospitalized with vomiting and diarrhea. He had an ulcerated digestive tract, and doctors inserted feeding tubes, a G-tube which delivered nutrients into the stomach and a J-tube which delivered nutrients to the small intestine, and a central line which delivered nutrients directly into the bloodstream, all bypassing as much of the injured digestive system as was necessary. Although the ulceration resolved within a year, the mother reported that when fed by mouth, or even through the G- and J-tubes, Keefe continued to experience gastrointestinal symptoms such as bloating, vomiting, and diarrhea. During a hospital stay in 1991, Keefe's doctor suggested that his feedings be advanced and particularly suggested that he be fed when no family members were present. The mother resisted, insisting that this would

---

[2]Munchausen Syndrome by Proxy is a medical diagnosis, Stedman's Medical Dictionary 1736 (26th ed. 1995), which was first described by a British pediatrician, Roy Meadow, who published two case studies of mothers who faked or caused illnesses in their children to gain attention and sympathy for themselves. Meadow, Munchausen Syndrome by Proxy: The Hinterland of Child Abuse, 2 The Lancet 343-345 (1977). Meadow modified a memorable term that another British physician, Richard Asher, had applied in 1951 to people who invented their own illnesses for the same reason. Recalling the fanciful, fib-telling, eighteenth-century German, Baron von Munchausen, Asher had coined the name "Munchausen syndrome." Meadow added two words, "by proxy," and published his observations. For further information on MSBP, see Schreier & Libow, Hurting for Love: Munchausen by Proxy Syndrome (1993).

harm Keefe. She preferred to take him home rather than allow the feeding trials that would demonstrate whether Keefe could eat normally. Her behavior, together with the numerous, life-threatening infections in his central line that Keefe had suffered to that point, prompted the doctor to file a 51A report. That report was unsupported.

The tubes — and primarily the line — remained Keefe's sole source of nourishment until he was seven years old. Throughout that time, many different people heard Keefe often say that he was hungry and wanted to eat, only to have his mother tell him that if he did, he would get sick. In those seven years, Keefe experienced thirty-eight inpatient hospital admissions. Despite a healthy immune system, he suffered from seven times the expected rate of infections in his central line according to his MGH records (and potentially even more, as he was treated at four additional hospitals whose lab reports were unavailable to the MGH physician compiling the statistics). These infections were caused by an unusually large number of different organisms, and the organisms themselves were of sorts not often seen in central line infections.

This high rate of infection was especially noteworthy since all of Keefe's caretakers were trained nurses. Keefe's mother is a nurse, and Keefe also had ninety-eight hours per week of home health care nursing, eighty hours of which were provided by his mother's domestic partner. The partner, with whom Keefe's mother shares a joint checking account and all household expenses, worked forty hours per week for each of two home health care agencies providing care for Keefe. She earned twenty dollars an hour, a total of $1,600 per week, for these services. Two newspapers ran stories about Keefe, and the household received Meals on Wheels — which Keefe, of course, did not eat — and a trip to Disney World courtesy of the Make a Wish Foundation.

During a hospital admission in 1992, a nurse discovered that the cap covering Keefe's central line was missing. It was found underneath the bed and appeared to have been forcibly removed. The mother had slept in Keefe's room that night and, when questioned, suggested that Keefe must have bitten it off. His treating physician testified that the cap was placed two or three inches below the collarbone, well out of reach of Keefe's mouth.

The mother also had reported that Keefe had episodes of seizures and extremely rapid heartbeat through the years, but

physicians who tested him found no neurological or cardiological problems. The mother claimed to have a videotape of Keefe having a seizure, but the two doctors of the Boston Juvenile Court clinic who viewed the tape remained unconvinced.

Between 1995 and 1996, Keefe's father sent four shipments of a barbiturate, Fioricet, to Keefe's mother at her request. She had told him that Keefe needed six to eight of these pills every day or else he would have to go on a morphine pump. There were no reports of Keefe ever having been prescribed Fioricet.

In October of 1996, the mother reported that Keefe had been having increased diarrhea for the previous six weeks. Over the mother's protests that Keefe had been screened for toxins and laxatives many times before (he had not), the pediatrician sent a stool sample to the lab. The results were indicative of laxative abuse. Concerned, the pediatrician called the mother, who stated that the call had "saved [Keefe] from a licking" because he had just fallen into a creek with his central line cap removed, and commenting that "I bet [Keefe]'s going to get sick." He was admitted to MGH two days later with a central line infection. When that infection cleared, he was discharged, then admitted to South Shore Hospital in November of 1996 with yet another infection. Complications from treatment proved life-threatening, and Keefe was transferred to the pediatric intensive care unit at MGH. Physicians at MGH began an extensive review of Keefe's medical history and determined that he likely was a victim of MSBP. The pediatric intensive care fellow then filed another 51A, and this time it was supported.

Once MSBP was the working diagnosis, Keefe's treatment team initiated the "definitive" diagnostic test: they restricted the mother's visitation and placed a twenty-four-hour-a-day sitter in Keefe's room. At the same time, they discontinued all of the fifteen or twenty medications he had been taking and advanced his feedings. Within the space of ten days, Keefe went from nothing but central line feedings to eating apples, pizza, and chicken fingers, and complaining when his macaroni and cheese was late. During these ten days, the mother refused to release Keefe's medical records from the other hospitals, resisted the feeding plan, and told Keefe at every opportunity that he was going to be sick. After he had tolerated normal food by mouth for several days with no problems, she told Keefe that coming to this hospital was "the biggest mistake we ever made." The next day, she cut out a cardboard sword and gun and told Keefe, "that's our way out of here."

Keefe was discharged from MGH in the department's temporary custody directly into the foster home of his paternal aunt and uncle, where he remains. For sixteen months before trial — and according to mother's brief, a total of three years now — Keefe has shown no sign of the various medical problems that had plagued him nearly all of his life.

Five treating physicians testified that, original ulceration aside, Keefe's eating problems had no organic cause. They stated that a tentative diagnosis of MSBP in Keefe's case was reached based on the number and types of central line infections despite a healthy immune system; the fact that, since the mother was a nurse, doctors would expect a child under her care to develop fewer infections than average; the cap incident; the mother's reports of seizures and rapid heartbeats that there was no evidence of and that never materialized in the hospital; the mother's resistance to advancing Keefe's feeding; and Keefe's consistent enthusiasm for eating (they explained that children with genuine gastrointestinal problems avoid eating because it hurts them).

A psychologist testified at trial about MSBP in general terms, including the fact that the perpetrator is usually the child's mother. She also testified about the telltale exchanges between Keefe and his mother. She observed the mother telling Keefe that he felt pain when he had not indicated so and testified that the mother seemed more anxious and concerned when Keefe was getting well than she had when he was sick. The psychologist also noted that Keefe did not react when he was separated from his mother — he did not ask for her or even mention her unless prompted. This, she said, was quite unusual. Also unusual, as noted by one of Keefe's physicians, was the mother's lack of expression of relief or pleasure that Keefe did not need a central line or tubes.

For the mother, three home health nurses, who had cared for Keefe one or two days a week, testified that they had witnessed some of Keefe's symptoms for themselves and that they had never seen the mother harm Keefe or otherwise act inappropriately. The mother also called a psychiatrist who testified that the mother's resistence was based on being an "overcaring" mother and that Keefe's medical history had shown periods of remission before. He stated that Keefe was getting better before they took him away from the mother and discussed the various medical diagnoses that he felt explained Keefe's reported symptoms.

After twenty-two days of trial over the course of five months in 1998, the judge issued his findings of fact, conclusions of law, ultimate findings, and order. He found that Keefe's parents were unable to meet his fundamental needs and that remaining in their custody put his welfare at serious risk. This ultimate finding rests on 314 subsidiary findings of fact intermingled with conclusions of law. As stated at the outset, the mother's principal challenge concerns the admission of expert testimony concerning MSBP and the effect it produced on the judge's assessment of her fitness as a parent.

1. *The admission of MSBP evidence.* The mother argues that it was error to admit evidence concerning this syndrome on the ground that it is akin to inherently prejudicial profile testimony, i.e., an expert's opinion as to certain characteristics common to individuals who abuse their children. See *Commonwealth* v. *Day*, 409 Mass. 719, 723-724 (1991) (expert opinion that the defendant fit profile of child abuser inadmissible because the mere fact that a defendant fits the profile does not tend to prove he committed the crime); *Custody of Eleanor*, 414 Mass. 795, 801 (1993) (in child custody cases profile evidence "cannot support a finding that sexual abuse actually occurred"). *Day*, however, differentiated between testimony concerning a "child battering profile" and "battered child syndrome," because battered child syndrome "has come to be a well recognized medical diagnosis, dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of injuries accidently caused qualifies them to express with reasonable probability that a particular injury or group of injuries is not accidental or is not consistent with the explanation offered therefor but is instead the result of physical abuse by a person of mature strength." 409 Mass. at 724, quoting from *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 77 (1978).

Here, nearly every page of the twenty volumes of testimony was offered, not to prove that the mother conformed to a stereotypical profile, but as a well recognized medical diagnosis, a relative of the admissible battered child syndrome. Like battered child syndrome, a diagnosis of MSBP is dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of genuine illnesses qualifies them to express with reasonable probability that a particular illness or group of ill-

nesses is not genuine but is instead the result of induction or fabrication of symptoms. See *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. at 77. Several other jurisdictions have admitted expert testimony concerning MSBP on a similar rationale. See *In the Interest of B.B.*, 500 N.W.2d 9, 12 n.2 (Iowa 1993) (child custody); *Place* v. *Place*, 129 N.H. 252, 255, 258-260 (1987) (child custody in the context of a modification of divorce decree); *In re S.R.*, 157 Vt. 417, 419-422 (1991) (child custody).

The mother's appeal, however, is not without merit. Among the evidence presented at trial were three pieces of problematic profile testimony. There was testimony (1) that perpetrators of MSBP typically are the children's mothers; (2) that they often are health care professionals themselves; and (3) that the father in MSBP cases is often emotionally or physically absent. Compare *Commonwealth* v. *Day*, 409 Mass. at 724-725 (testimony that abusers often are the partners of single mothers); *Commonwealth* v. *LaCaprucia*, 41 Mass. App. Ct. 496, 498-499 (1996) (testimony that incestuous families typically consist of an overburdened or impaired mother and a father more actively involved with the family).

Although New York has upheld the use of profile evidence in a case involving MSBP, see *In the Matter of Aaron S.*, 163 Misc. 2d 967, 977 (N.Y. Fam. Ct. 1993), aff'd sub nom. *In re Suffolk County Dept. of Social Servs.*, 215 A.D.2d 395 (N.Y. App. Div. 1995), we decline to do likewise. The profile evidence was "clearly inadmissible, and, in other circumstances, might be deemed sufficiently prejudicial to require reversal. In this case, however, the extremely strong evidence of . . . abuse" found in the sound testimony of experts,[3] the medical records, and the investigator's report "were, we are convinced, determinative for the judge." *Care and Protection of Leo*, 38 Mass. App. Ct. 237, 244 (1995). "[W]e have no doubt that the judge would have reached the same result" without the impermissible evidence. *Id.* at 243.

2. *Independent evidence supporting the judge's finding of unfitness.* The mother's contention that there was no direct evidence of her having harmed Keefe does not avail her, as there was sufficient circumstantial evidence to support a finding, by clear and convincing evidence, that the mother was making

[3]It is clear from the expert testimony that while these factors raised "red flags," prompting the doctors to consider MSBP, they did not rely on any profile evidence in establishing the diagnosis.

her child ill[4] and was thus unfit. The "clear and convincing" standard requires something less than the "beyond a reasonable doubt" standard imposed in criminal cases, see *Adoption of Iris*, 43 Mass. App. Ct. 95, 105 (1997), so "[r]eference to the manner in which courts apply the higher standard of proof in criminal cases [can] provide[] . . . useful analog[ies]" in child custody cases. *Care and Protection of Laura*, 414 Mass. 788, 791 (1993). Accordingly, because "[c]ircumstantial evidence is sufficient to establish guilt beyond a reasonable doubt, even for the conviction of the highest crimes," *Cramer* v. *Commonwealth*, 419 Mass. 106, 110 (1994), such evidence is sufficient in child custody cases. Nor is it necessary to the reasonable doubt standard — nor, by implication, to the clear and convincing one — for the Commonwealth to show that no one else could have committed the crime charged. See *Commonwealth* v. *Robinson*, 30 Mass. App. Ct. 62, 72 (1991); *Commonwealth* v. *Anderson*, 48 Mass. App. Ct. 508, 511 (2000). If conflicting inferences are both reasonable and possible, it is for the trier of fact to determine which is true. See *Cramer* v. *Commonwealth*, 419 Mass. at 110. See also *Custody of Eleanor*, 414 Mass. 795, 798-800 (1993); *Adoption of Hugo*, 428 Mass. 219, 229 (1998); *Adoption of Stuart*, 39 Mass. App. Ct. 380, 382 (1995).

Competent evidence formed the basis for each of the following facts, found by the trial judge, to implicate the mother. See *Custody of Two Minors*, 396 Mass. 610, 618 (1986) (trial judge's findings accepted absent clear error, and determinations of credibility are given deference). The mother refused to· permit doctors to test whether Keefe's gastrointestinal problems had resolved. She refused to allow her son to eat food. She told her son that eating would hurt him. She refused to permit Keefe to be outside of the constant presence of either herself or her partner. Her explanations for how his central line got infected were not credible. She lied and misrepresented facts to the doctors and nurses treating her son, and to the boy's father. She asked the father to send Fioricet for Keefe, but Keefe never had been prescribed Fioricet. When his doctor wanted to run a laxative screen, the mother asserted that Keefe already had been

---

[4]Direct evidence is sometimes available, as where the perpetrator has been caught in the act. See Hall et al., Evaluation of Covert Video Surveillance in the Diagnosis of Munchausen Syndrome by Proxy: Lessons From 41 Cases, 105 Pediatrics 1305 (June 2000).

screened repeatedly for toxins and laxative abuse, but he had not been. She reported symptoms which no one else observed and of which Keefe did not complain. Rather than demonstrating relief when she was told that her son's tubes could come out, she showed distress, and in addition to a psychological motivation, she had a financial incentive to keep Keefe sick. Together with the medical evidence and the court investigator's report, this provided ample support for the judge's findings.

We dispense with the remaining two claims summarily. First, although the mother criticizes the "hearsay" statement contained in the investigator's report that Keefe had a positive laxative screen, facts contained in such reports are admissible by statute where opposing parties have an opportunity to refute the report through cross-examination. See *Adoption of Astrid*, 45 Mass. App. Ct. 538, 546 (1998), and cases cited. See also *Adoption of Tina*, 45 Mass. App. Ct. 727, 732 n.8 (1998). The mother had this opportunity; her choice not to exercise it is of no moment. See *Care and Protection of Leo*, 38 Mass. App. Ct. 237, 243 (1995). Second, the mother argues that the judge erred in failing to discuss the testimony of the three home health nurses in his findings. This claim is without merit, as their testimony consisted mainly of assertions that they had never seen anything untoward and were shocked at the allegations. Such testimony is less than highly probative, and the judge was not clearly wrong in rejecting that testimony. See *Adoption of Hugo*, 428 Mass. at 229; *Adoption of Helen*, 429 Mass. 856, 864 n.12 (1999); *Adoption of Lorna*, 46 Mass. App. Ct. 134, 142 (1999).

Those findings provide clear and convincing evidence of current parental unfitness to provide for Keefe's welfare and best interests. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). They are ample, contain the requisite detail and specificity, and rest on competent evidentiary support. See *Custody of Two Minors*, 396 Mass. at 619.

The decree granting the petition to dispense with parental consent to adoption of Keefe is affirmed.

*So ordered.*