ADOPTION OF WILLAMINA.[1]

No. 07-P-796.

Middlesex. October 17, 2007. - February 22, 2008.

Present: KANTROWITZ, MILLS, & GREEN, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption. *Minor,* Adoption. *Evidence,* Child custody proceeding, Expert opinion. *Witness,* Expert. *Practice, Civil,* Findings by judge.

The evidence in a proceeding to terminate parental rights, which clearly established the detrimental effect of a mother's behavior on her minor child, supported the judge's conclusions that the mother was unfit to parent her child and that termination of the mother's parental rights was in the child's best interests, and the mother failed to demonstrate that the judge. assigned improper weight to expert testimony diagnosing the mother as suffering from a particular psychiatric disorder, or attached too little credit to the mother's benign explanations for the behavior that the judge found troubling. [235-238]

Discussion of the need to avoid undue reliance on diagnostic testimony describing general characteristics of a psychiatric disorder, or its tendencies for harm in extreme cases, in the context of a proceeding to determine parental fitness, and of the difficulties posed by a lengthy delay between the taking of evidence and the entry of findings of fact in such a case. [238-239]

PETITION filed in the Middlesex County Division of the Juvenile Court Department on January 30, 2004.

The case was heard by *Margaret S. Fearey,* J.

*Beth M. Nussbaum* for the mother.

*Monica C. Murphy* for Department of Social Services.

*Patrick J. Johnston* for the child.

*Lisa M. Kling* for the father.

GREEN, J. On appeal from a decree terminating her parental rights, Willamina's mother challenges the sufficiency of the evidence supporting the judge's conclusion that she is unfit to

---

[1] A pseudonym.

parent Willamina.[2] Specifically, the mother contends that the judge relied too heavily on opinions expressed by an expert witness who diagnosed the mother with factitious disorder by proxy (FDP),[3] essentially adopting the expert's ultimate conclusion as to her unfitness, rather than conducting a detailed analysis of the evidence of the mother's actual behavior and care for the child. Viewed without the lens of the FDP diagnosis, the mother contends, the finding of unfitness is unwarranted by the evidence, and the decree of termination cannot stand. Having carefully reviewed the record, together with the judge's findings, we affirm the decree.

*Background.* The following is derived from the judge's permissible findings and additional findings not in conflict with those findings. See *Bruno* v. *Bruno*, 384 Mass. 31, 35 (1981). Willamina was born on September 26, 1997, and was approximately eight years old at the time of trial.[4] For the first six and one-half years of her life, Willamina was in her mother's custody. Willamina's mother and father are not married, and their brief relationship ended before Willamina's birth. On November 12, 1997, the mother filed a complaint in the Probate and Family Court to establish the father's paternity. Eventually, the father acknowledged his paternity, but there ensued a dispute between the parents over custody and visitation.

The mother and father initially agreed to a visitation schedule in May, 1998, under which the father was permitted to visit with Willamina at the mother's home and at Willamina's day care facility. In August, 1998, however, visitation at the mother's home ceased when the mother sought and obtained a restraining

---

[2]The decree awarded custody to the child's father. See *Adoption of Willow*, 433 Mass. 636, 644, 650-651 (2001).

[3]Factitious disorder by proxy is also known as Munchausen syndrome by proxy. Stedman's Medical Dictionary 1906 (28th ed. 2006). The definition of Munchausen syndrome by proxy has not changed since *Adoption of Keefe*, 49 Mass. App. Ct. 818, 819 n.2 (2000), where we cited to the 26th edition of Stedman's Medical Dictionary. A person with FDP fabricates or exaggerates illnesses or physical ailments suffered by another person, typically the child of the person with FDP. In extreme cases, a parent with FDP may induce physical injury to the child, to support the assertion that the child is in need of medical treatment.

[4]Trial began on July 11, 2005, and continued over a total of nine days (many of them not consecutive) until October 27, 2005.

order against the father, based on allegations that the father handled Willamina in a vulgar and suggestive manner while changing her diaper.

In June, 2000, the mother and father reached an agreement, under which the father shared legal custody with the mother and was permitted supervised visitation with Willamina. The agreement, which included (among other provisions) detailed feeding instructions developed by the mother for the father to follow during Willamina's visits with him, was short-lived. In September and again in December of 2000, based on allegations expressed by the mother, a mandated reporter filed reports with the Department of Social Services (department) alleging sexual abuse of Willamina by her father.

The department's investigation did not support the allegation in the September report. The later allegation was unsupported as to the father, but was supported as to the possibility of an unknown perpetrator.

The department recommended a sexual abuse evaluation for Willamina, which was conducted between January and March, 2001.[5] The evaluating psychologist concluded that it was unlikely that Willamina had suffered sexual abuse; instead, Willamina appeared to be reacting to significant stress caused by conflict between her parents. The psychologist recommended services for Willamina, the mother, and the father.

Following completion of the sexual abuse evaluation, the father again enjoyed court-ordered, supervised visitation until the fall of 2003. At that time unsupervised visits began, followed by overnight visits in late December, 2003. The mother intruded upon and attempted to control both supervised and unsupervised visits between Willamina and her father. During some visits, Willamina would call her mother numerous times based, according to the visitation supervisor, on Willamina's belief that she needed to seek her mother's permission before engaging in certain activities, or that her mother needed to hear from her. Other times, Willamina refused to eat with her father because the mother had instructed Willamina not to eat during visits. The court investigator reported that the mother continued to tell department em-

---

[5] The father's visitation was suspended pending completion of the sexual abuse evaluation.

ployees and other professionals that the father had "done something" to Willamina, even after the sexual abuse evaluation concluded otherwise.

While in her mother's care, Willamina suffered from a number of illnesses, for which her mother subjected Willamina to aggressive medical attention. Less than a week after Willamina's birth, Willamina was taken to the hospital due to concerns over feeding and sleeping issues. Willamina was released without treatment after undergoing tests for sepsis.

The mother brought Willamina to her pediatrician and other physicians repeatedly. At some doctor visits, the mother presented Willamina with concerns regarding recurrent ear infections. On other occasions, the mother voiced concerns over Willamina's irritability, diaper rash, coughs, vomiting, constipation, diarrhea, diet, and stuttering.

So persistent and controlling was the mother's pursuit of medical care for Willamina that several providers found the mother too difficult to handle. Willamina's first pediatrician, at the Lahey Hitchcock Medical Center (Lahey Clinic), became so overwhelmed by the mother's demands regarding Willamina's care that the pediatrician sought legal assistance and recommended that the mother find another doctor for Willamina. Similarly, the mother became upset when another of Willamina's providers, a nurse practitioner at Woburn Pediatrics, declined to recommend aggressive treatment for minor symptoms. In response to the mother's difficult behavior, the nurse recommended that the mother find another physician; the mother thereafter transferred Willamina's care to another pediatrician in the same practice group. Overall, Willamina saw at least five different pediatricians during her six years in the mother's care.

The mother often pressed Willamina's pediatricians to pursue specific treatments. When unsuccessful in persuading Willamina's primary care providers to administer such treatments, the mother sometimes independently sought specialists to perform them.[6] Other times, after pressing aggressively for treatment, the mother did not follow through with the resulting medical

---

[6]As an example, the mother presented Willamina to her pediatrician at the Lahey Clinic with blocked tear ducts, which the pediatrician believed would resolve themselves but the mother believed required intervention. Unsatisfied with the pediatrician's advice, the mother found an ophthalmologist who agreed to operate.

recommendations.[7] Beyond the mother's response to particular medical advice, Willamina's primary care providers developed the view that the mother consistently tended to exaggerate Willamina's symptoms and make a great deal out of minor issues.

Throughout her time in the mother's custody, Willamina tended to vomit and gag. At the beginning, Willamina's vomiting and gagging appeared related to certain food textures. Later, Willamina's doctors believed the vomiting and gagging to be behavioral.

Due to increasing concerns that the mother's behavior was affecting Willamina detrimentally, the department referred the family to a psychologist with expertise in FDP for a comprehensive parenting and psychological evaluation. The psychologist conducted the evaluation from June, 2002, through November, 2003, and issued a report in December, 2003. Based largely on the psychologist's evaluation of the relationship between Willamina and her mother as dangerous and unhealthy, the department filed the instant petition on January 30, 2004, seeking to remove Willamina from her mother's custody. The department obtained custody and placed Willamina with the paternal grandparents. After a hearing, a judge of the Juvenile Court awarded temporary custody to the department on March 3, 2004; the department in turn placed Willamina with her father pending trial.

After removal from her mother's custody, Willamina's physical and emotional condition began to improve. While living with her mother, Willamina suffered from gagging and vomiting attacks and was often late for school.[8] Within a few months of going to live with her father, Willamina was no longer gagging or vomiting and had perfect school attendance.[9]

---

[7]For example, the mother declined to follow a recommendation that Willamina have tubes placed in her ears to relieve Willamina's frequent ear infections. In another instance, the mother called Willamina's pediatrician repeatedly with complaints of headaches, to the point where the pediatrician finally referred Willamina to a neurologist. The mother then waited several months to pursue the referral, and thereafter missed several appointments, and ultimately did not follow through with the recommended magnetic resonance imaging (MRI) procedure.

[8]Willamina started kindergarten in September, 2003. In the months prior to removal in January, 2004, the mother brought Willamina to school late twenty-three times. During the same period, Willamina was absent from school four times.

[9]Willamina continued to gag and vomit in the first few months that she

During the period between removal and trial, the department's case plan required the mother to attend therapy with a therapist specializing in FDP treatment and to address the reasons for Willamina's removal. As of the time of trial, the mother had attended sessions with a therapist one or two times, but her chosen therapist was not a FDP specialist. She denied that she suffered from FDP. The mother declined family-based services offered by the department.

At trial, the judge heard testimony from two expert psychologists, from the appointed guardian ad litem, from two social workers who had worked with the mother during the department's involvement, and from a number of lay witnesses (including the mother and father).[10] Thirty-nine exhibits were admitted in evidence, including Willamina's pediatric medical records and the written reports of the guardians ad litem and the examining psychologist.[11]

*Discussion.* As noted in our introduction, the mother principally contends that the judge failed to conduct a detailed examination of primary facts, instead adopting the diagnosis and conclusions of the department's psychologist as the basis for the conclusion that the mother is unfit to parent Willamina.[12] Our review of the record and the judge's findings suggest otherwise.

"When reviewing a decision to terminate parental rights, we must determine whether the trial judge abused [her] discretion or committed a clear error of law. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). Subsidiary findings must be

lived with her father, and the trial judge's finding to the contrary was clearly erroneous. However, the record reflects that, after a few months in her father's custody, and with the assistance of a therapist, the vomiting ceased and did not recur.

[10]The parties also stipulated to the admission of the testimony given by Catherine Ayoub, Ph.D., a licensed psychologist, at the temporary custody hearing.

[11]The report of Ayoub included recitation of the results of her interviews with numerous third parties, including various medical personnel who treated Willamina. The report was entered without limitation or objection, and the hearsay contained in it was accordingly admitted for all purposes.

[12]The mother also challenges certain of the judge's specific findings of fact, though her criticisms of those findings serve mainly to illustrate her contention that the judge merely adopted the expert's conclusions as her own.

established by a fair preponderance of the evidence, *Care & Protection of Laura*, 414 Mass. 788, 793 (1993), and will not be disturbed unless clearly erroneous. *Custody of Eleanor*, 414 Mass. 795, 799 (1993)." *Adoption of Elena*, 446 Mass. 24, 30-31 (2006). We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence. *Id.* at 31.

The mother contends that a number of the trial judge's findings are clearly erroneous. However, she has directed no argument to several of the challenged findings, and our independent review of the record finds support for each.[13] Two other findings challenged by the mother are likewise supported, and are relatively immaterial in any event.[14]

Other findings recite Ayoub's diagnosis of the mother as having FDP and state the trial judge's view that Ayoub's testimony was credible, subject to limitations or qualifications deriving from the testimony of Eric Mart, Ph.D., a licensed psychologist, who testified on the mother's behalf. As summarized in findings, Mart cautioned that FDP should not be viewed as an all or nothing diagnosis, but as a spectrum disorder, and that the

---

[13]The mother challenges four findings without explanation or argument. We note in particular that one of those findings recites the mother's allegations that the father cared for Willamina in an inappropriate manner and states that the judge did not find the mother to be credible as to those allegations. As we have noted, the credibility of witnesses is the particular province of the trial judge. Moreover, the trial judge's rejection of the mother's credibility on the subject is consistent with the conclusions reached by various independent third party professionals concerning the same allegations.

[14]In one of those findings, the trial judge observed that, though the mother considered her pregnancy with Willamina to be "high risk," the only risk apparent from objective sources was the mother's anxiety. There is record support for the conclusion that the mother was anxious throughout her pregnancy. Willamina was delivered by means of a scheduled cesarean section, due to two prior ectopic pregnancies. However, there was no indication that the need for a cesarean section, or the prior ectopic pregnancies, made the mother's pregnancy high risk in any way. The mother also contends that the trial judge erroneously found that Ayoub attempted to treat the mother, and claims prejudice stemming from the implication that the mother refused services. The challenged portion of the finding reads, "Numerous clinicians evaluated and attempted to treat Mother and [Willamina], including Dr. Ayoub." Though the finding is not expressed as clearly as it might be, there is no dispute that Ayoub evaluated the mother, or that numerous clinicians attempted to treat her. In any event, the trial judge placed no identifiable reliance on the adverse implication identified by the mother.

diagnosis itself was less important than the impact of the mother's behavior on the child. The reconciliation of the competing testimony of the two experts, and the weight and credibility to assign to each, was within the judge's purview as finder of fact. Of particular significance is the judge's statement that she agreed with Mart that the diagnostic label attached to the mother is less important than the impact of the mother's behavior on Willamina. As to the latter, the trial judge recited in summary form the types of behavior she viewed as particularly harmful to Willamina's well being. Each of those cited behaviors and effects, moreover, finds support in the record.[15]

The mother similarly challenges a series of findings describing the potential deleterious effects on a child from a parent with FDP. Those findings were based on Ayoub's testimony. The judge explicitly stated that she found Ayoub's testimony credible. Though the mother attempts on appeal to suggest that Ayoub's testimony concerning the diagnosis or effects of FDP should not have been admitted, there was no objection to the testimony at trial.[16] Moreover, as we have noted above, the judge explicitly stated her view that, quite apart from any diagnostic labels attached to the mother or her behavior, the underlying behavior itself was harmful to Willamina.

The remainder of the findings challenged by the mother likewise find support in the record, with the exception (as observed in note 9, *supra*) of the statement that Willamina had no further problems with gagging after being placed in the father's care. In sum, as the department observes in its brief, the mother's

---

[15]The judge cited the mother's excessive focus on, and exaggeration of, minor physical symptoms, which led to intrusive and unnecessary medical attention, attendance issues at school, and causing Willamina to view herself as "sick." The mother's challenge to the finding on attendance issues seeks to focus solely on absences (of which there were four during Willamina's first semester in kindergarten) to the exclusion of tardiness (of which there were twenty-three).

[16]We accordingly do not consider the mother's contention that we should strike Ayoub's testimony, on the ground that the FDP diagnosis is unreliable, or that it constitutes impermissible profiling. The diagnostic testimony against which we cautioned placing undue reliance in *Adoption of Keefe*, 49 Mass. App. Ct. 818, 824 (2000), was admitted over the mother's objection at trial in that case, see *id.* at 819, and in any event, that testimony did not cause us to set aside the judge's finding of unfitness which (as in the present case) found independent support in the mother's underlying behavior.

principal arguments are that the judge assigned improper weight to Ayoub's testimony, and attached too little credit to the mother's benign explanations for the behavior the judge found troubling. Such contentions are to no avail. See *Adoption of Quentin*, 424 Mass. 882, 886 n.3 (1997); *Adoption of Elena*, 446 Mass. at 31.

Based on the judge's supported findings, we further have no difficulty affirming her conclusion that the mother is unfit to parent Willamina, or that termination is in Willamina's best interests. The evidence clearly establishes the detrimental effect of the mother's behavior on Willamina, and Willamina has thrived in her father's care. We accordingly affirm the decree.

Two features of the present case lead us to further comment. First, though the absence of an objection at trial to Ayoub's testimony waived any challenge by the mother on appeal to the judge's reliance on it, we again caution against undue reliance on diagnostic testimony describing general characteristics of a psychiatric disorder, or its tendencies for harm in extreme cases. See *Adoption of Keefe*, 49 Mass. App. Ct. 818, 824 (2000). Though the judge in the present case disavowed principal reliance on such general or diagnostic conclusions or "profiling," the scope, range, and depth of discussion devoted in the judge's findings to Ayoub's testimony, as compared to the underlying subsidiary facts on which Ayoub based her conclusions, surely fueled the mother's concern that the judge adopted the expert's conclusion on the ultimate question of the mother's unfitness, rather than conducting a thorough examination of the subsidiary facts themselves. Though the judge was entitled to rely on the expert's opinion testimony, a trial judge should describe in detail the subsidiary facts which support her conclusions, rather than to recount the opinions and conclusions of an expert to the same effect. Moreover, careful attention to the facts of the particular case is especially important where a psychiatric diagnosis may cover a range of behaviors and potential impacts, extending from the relatively mild to the extreme. It is of course the facts of the particular case, rather than general (or potential) tendencies of a disorder, which must determine whether a particular parent is unfit.

We also note with some concern the fact that, though the judge entered her decree of termination on January 17, 2006,

she did not enter her findings of fact until almost eleven months later, on December 14, 2006. We have noted, in *Adoption of Rhona*, 57 Mass. App. Ct. 479, 486 (2003), the difficulties posed by a lengthy delay between the taking of evidence and the entry of findings of fact. An independent concern derives from the fact that an appellant may not enter an appeal on our docket until the record is assembled, and the findings are an essential element of the record on appeal. The practical effect is that the appellant mother is precluded from prosecuting her appeal during the delay in entry of the trial judge's findings, despite the fact that the decree is effective upon entry, and the importance in the child's best interests of prompt resolution of any challenge to the decree. See *Adoption of Galen*, 425 Mass. 201, 206 (1997), quoting from *Adoption of Jenna*, 33 Mass. App. Ct. 739, 742 (1992) ("It is in the best interests of children that there be a speedy resolution of adoption proceedings . . . '[n]o cases of any kind have a greater claim for expedition at all stages than those involving care and custody of children' "). Accordingly, the findings of fact should be entered both promptly after conclusion of trial and, as required by time standards, not later than ninety days after the close of evidence. Juvenile Court Standing Order 1-04 III. C. (2004).

*Decree affirmed.*