Both the mother and father appeal the termination of their parental rights with respect to their daughter, Henrietta. We consider the arguments of each parent in turn and affirm.
Background. We summarize the facts and procedural history, drawing from the judge's findings and reserving details for the discussion of the issues.
The child was born in September, 2007. In May, 2015, the Department of Children and Families (the department) filed a care and protection petition pursuant to G. L. c. 119, § 51A, following a report from Yale New Haven Hospital that, on April 15, 2015, a caustic substance was inserted into the child's cecostomy tube. The father confessed to police that he injected the child's cecostomy tube with "Liquid Plumr" drain cleaner (caustic substance), although he later recanted the confession. Each parent contends the other parent poisoned the child with the caustic substance. The trial judge found that either the father committed the poisoning, though the judge did not credit the timing of when the caustic substance was introduced, or the father was aware that the mother poisoned the child and he intended to take the blame. The trial judge further found that the father's confession was rehearsed with, and concocted with or by, the mother. As a result of this poisoning, the child experienced profound and permanent injuries.[3]
The department also presented evidence that the child's history of medical illnesses was fabricated. The mother represented that the child was chronically ill. The mother reported that the child experienced various symptoms, prompting medical intervention including but not limited to the child undergoing medical testing,[4] receiving medication,[5] and undergoing medical procedures largely based on symptoms reported by the mother.[6] Several of these reported symptoms, including reports that the child suffered from seizures[7] and low blood sugar,[8] were uncorroborated by medical testing, were only observed by the mother or father, or were absent from the child's medical records. The department's expert, Dr. Rebecca Moles, personally examined the child, reviewed the child's medical history, and opined that the child experienced the consequences of caregiver fabricated illness[9] attributable to the mother.[10]
The child was removed from her parents' care in May, 2015. She met the foster parent in November, 2015, and has lived with her since discharge from the hospital in February, 2016. Although the child experiences continued medical needs as a result of the trauma to her organs, she no longer uses the wheelchair, leg braces, or cooling vest that she used while under her parents' care, and at school she does not require the assistance of a one-on-one aid or nap room. She does not carry a diagnosis of hypoglycemia, glutaric acidemia, seizures, or mitochondrial disorder. She does not require treatment of her 22Q11 microduplication and it remains of unknown significance. There has been a marked decrease in central line infections since the child was removed from the parents' care.[11]
After thirty days of trial that included approximately 6,000 pages of testimony from both parents and twenty-one other witnesses, as well as seventy exhibits, the trial judge adjudicated the child in need of care and protection and terminated the parents' rights based on medical neglect and abuse. Both parents appealed.
Discussion. 1. Mother's arguments. a. Prior care and protection findings. The mother argues that the trial judge improperly considered and gave preclusive effect to findings from a care and protection petition the department filed regarding the child in 2009.[12] In the first case, a different judge initially adjudicated the child in need of care and protection and found the parents unfit.[13] She later vacated "[f]indings of [l]aw" that the child was in need of care and protection and that the parents each were unfit, and dismissed the case. The judge in this second case (sometimes referred to as the trial judge) took judicial notice of the findings, procedural history, and orders from the first case, and also admitted in evidence the findings of fact made on the first petition.
The mother argues that the trial judge improperly considered the findings from the first case and barred her from inquiring about that time period as it impacted issues in this second case.[14] The department disputes this, contending that the trial judge noted he would not relitigate the prior case but allowed the parties to present evidence of rebuttal of any finding they wished to dispute. The child concedes that there was error. It is well established that findings from a previous care and protection proceeding may be offered but are not preclusive and additional evidence may be offered by any party to support or contradict them. See Adoption of Frederick, 405 Mass. 1, 4-5 (1989) ; Adoption of Paula, 420 Mass. 716, 721-722 (1995) ; Adoption of Tina, 45 Mass. App. Ct. 727, 731-732 (1998).
Assuming without deciding that the judge impermissibly gave preclusive effect to the findings of fact from the first case, we review for prejudicial error. See Adoption of Paula, 420 Mass. at 722. We conclude that any error was harmless.[15] The overwhelming majority of the findings in the second case address the child's medical history and the parents' actions after March, 2011, through the 2016 trial. Neither parent challenges as clearly erroneous any finding of fact involving events after March, 2011. The father's injection of the caustic substance into the child and the mother's related actions would constitute clear and convincing evidence of the mother's unfitness and warrant termination. Although the judge credited the father's confession, the judge found that one or both parents was involved, that the mother helped to prepare the father's confession, and that, at the least, she was unable to protect the child from grievous injury. The mother does not contend that anyone other than the father injected the caustic substance. As a result, the child experienced permanent bodily injuries. The mother's failure to protect the child and her assistance to the father would be sufficient to terminate the mother's parental rights. See Adoption of Lorna, 46 Mass. App. Ct. 134, 140-141 (1999) ("While at least one [parent] had to have abused [the child], both [parents] were deemed unfit for their inability to protect the [child] from future abuse").
In addition, within only the March, 2011, through 2015 timeframe, there were extensive findings that the mother, who was the child's primary caregiver, was medically abusive of the child. The judge found that, as a result of caregiver fabricated illness mainly attributed to the mother, the child experienced numerous uncorroborated medical issues, underwent "unnecessary and dangerous" medical procedures, and received potentially unnecessary medical treatments which she no longer received after removal from her parents' care. The detailed findings about the child's medical history following March, 2011, and the conclusion that the majority of the illnesses that the mother said the child suffered from were fabricated and were the result of the mother's medical neglect and abuse, supported termination. See Adoption of Willamina, 71 Mass. App. Ct. 230, 238 (2008) (considering effects of Munchausen syndrome by proxy as grounds for termination).
Therefore, any error from the trial judge's consideration of facts from the first case was harmless.
b. Department's expert. The mother also raises several arguments related to the department's expert, Dr. Moles, who opined that, aside from the injuries caused by the caustic substance, the majority of the child's illnesses were due to or exacerbated by caregiver fabricated illness.
First, the mother challenges Dr. Moles's review of medical records back to the child's birth to reach her opinion, as it reached back into the timeframe of the first case. Although Dr. Moles's testimony included some discussion of the child's medical history prior to 2011, a review of the judge's findings indicate that he largely relied on her testimony about the child's medical condition after the first case, the deterioration of the child while she was in her parents' care, and the child's improved medical status after removal from her parents' care in May, 2015. Based on this testimony, the trial judge concluded that the child's illnesses resulted from caregiver fabricated illness. Specifically, the judge credited Dr. Moles's testimony that the child's gastrointestinal issues, blood and central line infections, alleged seizures, continued testing for genetic disorders, anticoagulant issues, and orthopedic issues were all the result of caretaker fabricated illness, largely based on testimony about the child's health between 2011 and 2016.
The mother also argues that Dr. Moles lacked an expertise in genetics to opine that a genetic abnormality did not cause the child's illnesses, and that her conclusion to this effect was based on inadmissible hearsay. Dr. Moles was qualified as an expert in pediatric medicine and child abuse. On cross-examination, Dr. Moles testified that she reviewed the child's medical records and spoke with a geneticist involved with the child's care to reach her conclusion.[16] The judge offered to expand the witness list to allow the geneticist to be called to testify, but the mother did not subpoena the geneticist. "It is established that an expert may 'base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider formulating an opinion.' " Adoption of Seth, 29 Mass. App. Ct. 343, 352 (1990), quoting from Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 531 (1986).
c. Mother's experts. The mother also argues that she was denied due process because her experts were prevented from discussing events prior to March 28, 2011, whereas Dr. Moles testified to the child's early medical history. The mother offered three experts: Joel Huberman, qualified as an expert in molecular biology with a focus in genetics; Eli Newberger, qualified as an expert in pediatric medicine and Munchausen syndrome by proxy ; and Frank Marotta, qualified as an expert in psychology, Munchausen syndrome by proxy, and trauma, and testifying as the mother's treating therapist. However, as Dr. Moles's testimony about the child's early medical history was not central to her opinion, and since termination would be warranted based on events between March, 2011, and the end of trial, there was no prejudicial harm in preventing the mother's experts from testifying about the child's early medical history.
Furthermore, the mother contends that the trial judge failed to address conclusions reached by her experts that contradicted Dr. Moles. We disagree. The judge did not overlook the expert testimony of Dr. Newberger and Dr. Huberman; the judge addressed why their testimony was not credible.[17] Additionally, the judge was not obligated to credit Dr. Marotta's opinion that the child's illnesses were not a result of caregiver fabricated illness. Where the judge's determination was based on the credibility of competing experts, we give deference to the trial judge. See Custody of Two Minors, 396 Mass. 610, 618 (1986) ; Adoption of Hugo, 428 Mass. 219, 229 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999) (trial judge is in best position to evaluate evidence).
2. Father's arguments. a. Burden shifting. The father first argues that the judge improperly shifted the burden to him to prove his own fitness. We disagree.
The burden is on the department to prove parental unfitness by clear and convincing evidence. See Santosky v. Kramer, 455 U.S. 745, 769 (1982) ; Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, 392 Mass. 696, 698 (1984). That burden never shifts to the parents. See Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 389 Mass. 793, 802-803 (1983).
As a preliminary matter, we note that the father exercised his privilege under the Fifth Amendment to the United States Constitution against self-incrimination 546 times and that the trial judge permissibly drew a negative inference from each assertion. See Care & Protection of Quinn, 54 Mass. App. Ct. 117, 121 (2002). However, the trial judge did acknowledge that, on its own, a negative inference was insufficient to satisfy the department's burden. See Custody of Two Minors, 396 Mass. at 616.
The father contends that four conclusions of law indicate that the trial judge impermissibly shifted the burden. In the first instance, when discussing the parents' cooperation with the department, the judge concluded that the "Father's attorney refused to allow Father to interact with the Department while he was incarcerated. Father has presented no testimony and shown no evidence of his taking steps towards becoming fit." The social worker assigned to the family could not provide services to the father because she was unable to see him while he was incarcerated. The judge did not shift the burden when he made this conclusion. See Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption, 399 Mass. 279, 289 (1987) ; Adoption of Rhona, 63 Mass. App. Ct. 117, 126 (2005) ("Evidence of parents' refusal to cooperate with the department ... is relevant to the determination of unfitness").
Similarly, after finding the father currently unfit and while considering if it was in the child's best interests to terminate his parental rights, the judge concluded that "[e]vidence was not presented on ameliorative steps taken by parents to address the circumstances that led to the child's removal." In terminating the father's parental rights, the judge was required to consider if the father was offered or received services from the department. See G. L. c. 210, § 3(c )(iii). Again, the conclusion that no evidence was presented on this point did not shift the burden.
Next, the father contends that the trial judge shifted the burden when he concluded that the parents "have not shown how they, as a unit, would be able to protect [the child] from this happening for a third time." This conclusion came only after the judge reviewed the harm that the parents caused to the child, including Dr. Moles's opinion that the mother falsified or exaggerated the child's medical conditions and that the father "was an active parent while this happened." The judge may consider both preventive and remedial purposes when determining parental fitness. See Custody of Two Minors, 396 Mass. at 620. Read in context, the statement was a summation of the evidence and the issues at hand. See Adoption of Terrence, 57 Mass. App. Ct. 832, 836 (2003) (in context of over-all findings, use of word "demonstrated" did not indicate that judge improperly shifted burden of proof).
Lastly, the father argues that the judge shifted the burden while considering termination when he concluded that "[t]he parents have shown very little to prove that they would be able to overcome these shortcomings and properly care for [the child]." The judge may properly consider the reasonable likelihood that parental unfitness is only temporary before terminating a parent's rights. See Adoption of Carlos, 413 Mass. 339, 350-351 (1992). Again, read in its entirety, the judge considered predictive harmful effects while maintaining that the burden remained on the department. Ibid. The judge did not impermissibly shift the burden of proof to the father.
b. Troublesome facts. The father also contends that the judge failed to consider certain evidence and that we should therefore grant less deference to his decision.
"Troublesome facts ... are to be faced rather than ignored.... Only then is the judge's conclusion entitled to the great respect traditionally given to discretionary decisions." Adoption of Stuart, 39 Mass. App. Ct. 380, 382 (1995), quoting from Adoption of a Minor (No. 2), 367 Mass. 684, 688-689 (1975).
The father argues that he could not have injected the caustic substance into the child's cecostomy tube because the evidence that the caustic substance would have affected the child in a short period of time was inconsistent with the timeframe of his confession. However, the judge did consider the discrepancies in the timeline. Although the judge credited the father's confession insofar as the judge found that the father injected the caustic substance into the child's cecostomy tube, the judge specifically did not credit the "precise details" of the timing or sequence of events. The judge further concluded that the confession indicated that the father either directly injected the caustic substance himself or that he was aware that someone else, likely the mother, did so and he intended to take the blame. Even if the father's role was "limited" to his false confession and his failure to protect the child, termination would nonetheless be supported by the facts. See Adoption of Lorna, 46 Mass. App. Ct. at 140-141. We are satisfied that the judge properly considered the evidence before him.
Finally, the father also argues that the judge ignored evidence of his positive interactions with the child. Termination is supported by ample evidence where the father injected the child with a caustic substance or was aware that the mother did so and where he was an active parent while the mother falsified or exaggerated the child's medical condition, resulting in serious medical injuries. See Adoption of Rhona, 63 Mass. App. Ct. 117, 125 (2005).[18]
Decrees affirmed.

During two subsequent surgeries, about two-thirds of the child's intestines and forty percent of her bladder had to be removed. She must wear an ostomy bag because she cannot pass stool through her anus. The child requires continued medical assistance and faces ongoing risk of infection, malnutrition, dehydration, and possible further surgeries as she ages.

For example, in 2013, the child underwent testing to determine if she had glycogen storage disease, mitochondrial disorder, fatty acid oxidation defect, maple syrup urine disease, or certain enzymes in gluconeogenesis. She tested negative for any of these abnormalities. In 2014, the child was tested for a genetic defect. An initial test showed a defect in her "ETFB" gene and further testing was ordered. That further testing included deoxyribonucleic acid sequencing and a skin biopsy, both of which tested negative for the metabolic disorder associated with defective ETFB genes. Despite the negative testing, the mother reported to a different physician later that year that the child was diagnosed with the metabolic disorder.

In 2011, the child was prescribed medication based on the mother's concern that the child may have a metabolic or mitochondrial disorder. In 2012, the child's primary care physician prescribed medication based on the parents' report that the child experienced a vomiting feeling in her mouth. Also in 2012, the mother reported to a neurologist that the child experienced migraines, despite a previously normal magnetic resonance imaging. The child was prescribed migraine medication. In 2013, the mother reported that the migraines worsened despite the medication. The mother requested that the child be prescribed narcotics. The child's neurologist refused.

In 2012, the child underwent an upper endoscopy based on the mother's report that the child experienced difficulties swallowing. The endoscopy showed no major issues. In 2013, the mother reported that the child experienced low blood sugar or hypoglycemia based on the child's symptoms and glucometer readings done at home. A gastrostomy tube (G-tube ) was inserted into the child's stomach, which allowed her to receive feeding and medication directly. The parents requested that the G-tube be placed so they could feed the child at night without waking her. The recommendation to place the G-tube was not based on medical necessity. In 2014, a cecostomy tube was implanted into the child's cecum based on the mother's reports that the child experienced chronic constipation.

In 2012, the mother reported that the child was experiencing seizures. A previous electroencephalography (EEG) test was normal, and the mother refused to have the child admitted to the hospital for overnight EEG monitoring. In 2013, the mother reported that the child had been rediagnosed with epilepsy in 2012, but the medical records did not support the statement of diagnosis or rediagnosis. Later in 2013, the mother reported that the child's seizures had improved. The child was weaned off her seizure medication, but the mother reported that the child experienced a seizure. The child was restarted on medication. In 2014, the child was reportedly taking three medications to treat seizures.

In 2013, the mother reported that the child experienced low blood sugar based on the mother testing the child's glucose levels at home. See note 5, supra.

Dr. Moles defined caregiver fabricated illness as "where a caregiver either falsifies symptoms, so exaggerates symptoms, creates symptoms or induces illness in a child." Caregiver fabricated illness was formerly known as Munchausen syndrome by proxy.

Dr. Moles opined that several of the symptoms that the mother reported or medical issues that the child experienced were the result of caregiver fabricated illness, including gastrointestinal issues, blood and central line infections, alleged seizures, alleged genetic disorders, anticoagulant issues, and alleged orthopedic issues. For example, Dr. Moles opined that the report of seizures was a component of caregiver fabricated illness because there was no documentation in the medical records that the child experienced a seizure witnessed by a medical provider, and because the child stopped receiving antiseizure medication in 2015 with no adverse consequences. Dr. Moles also opined that the child's difficulties with her anticoagulant levels were also a result of caregiver fabricated illness. The child began experiencing blood clots in 2014 as a result of her central line and was started on anticoagulant medication. She had difficulty keeping her anticoagulant levels in a "therapeutic" range between 2014 and 2015. At times, the mother administered the child's anticoagulant medication. The child's anticoagulant levels entered the therapeutic range within days after she went into the department's custody and the doses of medication were decreased.

The child experienced central line infections between 2014 and 2015. Dr. Moles opined that the number and type of infections were unusual and of special concern. The child's blood cultures reflected infections typically found in saliva, stool, or the gastrointestinal tract, not in blood.

For clarity, we refer to the earlier proceeding as "the first case" and the case on appeal as "the second case."

Although the child remained in the department's custody, the department entered into a temporary agreement with the parents and the child went home with the parents that same day.

The mother also argues that the findings from the first case were inadmissible because they were vacated in March, 2011. The judge in the first case vacated the adjudication and conclusion that the parents were unfit but did not vacate the findings.

Though only seven of the 187 factual findings entered in the second case derive from the findings of fact in the first case, the mother contends that those seven findings created a lens coloring the entire second case.

The mother challenged the completeness of the records admitted at trial. Dr. Moles documented her notes in a spreadsheet, which she used to create the report admitted at trial. The Yale New Haven Hospital child abuse team maintained the spreadsheet in a database separate from medical records and so it was not produced in discovery. However, the mother's attorney had Dr. Moles's report and the opportunity to cross-examine Dr. Moles about the child abuse team's records and, in response to the mother's motion to compel the child abuse team's records, Dr. Moles was recalled to testify further. Dr. Moles testified that a subpoena would not produce the records maintained by the child abuse team, but that the information in the team's records were also in the child's medical records.

Specifically, the judge found that Dr. Newberger was not credible where the mother and one of her attorneys assisted his preparation of the chalk to use while testifying, where he referred to them as his "research assistants," and where they reviewed medical files and brought inconsistencies or allegations of caregiver fabricated illness to his attention. Additionally, the judge did not find Dr. Huberman to be credible where he had never treated patients, never met nor examined the child, was not qualified to give a medical opinion, and was guided by instructions from the mother about the specific areas of genetics to be investigated.

To the extent that we do not address the other contentions of the mother or father, they "have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).